## HANDY et al. v. AMERICAN FLYER MFG. CO.

District Court, S. D. New York.
Sept. 18, 1930.

Joel B. Liberman, of New York City (John M. Cole, Walton Harrison, and George F. Scull, all of New York City, of counsel), for plaintiffs.

Robert B. Killgore, of New York City (David P. Wolhaupter, of Washington, D. C., of counsel), for defendant.

COXE, District Judge.

This is a patent infringement suit involving patent No. 1636416 to L. Gessford Handy for "Track for Toy Electric Trains." The application was filed November 19, 1921, and the patent issued July 19, 1927. Claims 2, 3, and 5 only are in issue.

The plaintiff Handy is the patentee and owner of the patent, and the plaintiff Lionel Corporation is the exclusive licensee, under a license granted September 22, 1926, by which Handy receives a royalty on each embodiment of the invention sold. Between July 19, 1927, when the patent issued, and January 1, 1930, the Lionel corporation manufactured and sold 114,467 special track sections under the patent.

The defendant, American Flyer Manufacturing Company, is an Illinois corporation, and has for many years manufactured and sold toy trains, tracks, and equipment. In 1921, the only manufacturers of such toy trains, tracks, and equipment in this country were the American Flyer, Lionel, and Ives Companies; and today these same three companies, with one other, practically dominate the American field.

The manufacture and sale by the defendant of the special track section, alleged to infringe, is admitted, and, inasmuch as it is identical with the Handy section, no question of infringement is involved, if the Handy patent is valid. The only defense relied on is invalidity.

Toy tracks for trains have been known for many years, and are now well standardized. They are either of the two-rail type, in which the engine is driven by a spring, or of the three-rail type, in which the engine is equipped with an electric motor, and takes its current from the wheel-bearing rails and the third rail. Inasmuch, however, as the Handy patent relates to the three-rail type, discussion will be confined to that type.

The three-rail tracks are prepared in sections, with uniform rail spacing, and metal cross-ties. The rails of each section have metal conducting pins adapted to fit into the corresponding rails of adjoining sections so as to form continuous rails of any length and of any desired number of sections. Invariably, the tracks are operated as endless systems, as circles, figure eights, and the like, thereby permitting uninterrupted running of the train around the track.

In his specification, Handy states:

"Heretofore it has been common to make up the track for electric toy trains to include three rails, as 1, 2 and 3, the central rail, as 2, being insulated from the others, and arranged to carry one side of the circuit, the opposite side being carried by the two outside rails. * * *

"Each of the rails of these sections have metallic pins, as 4, at one end thereof, adapted for entry pockets, as 5, of adjacent sections, so as to hold the sections together."

He describes his invention generally as follows:

"According to the present invention, however, one of the outside rails, as 3, in Fig. 2,

is insulated from rails 1 and 2, and has its connecting pin, as 6, made also of insulating material, so that said rail 3 of this section will be insulated from the rail 3 of the next adjacent section in both directions.

· "The three rails of a section are connected together by cross ties 12, which usually are of conductive material. The manner in which the rail 3 is insulated from the other rails may take any desired form, but preferably consists in placing a suitable piece of insulating material as 13, about the lower portion of the rail where the rail is engaged by the retaining fingers 14 of the tie. This manner of insulating the rail 3 is the same as is now in common employment for insulating the rail 2, as illustrated." ·

The Handy special track section is exactly the same as the regular sections, except for (1) the insulating pins at the ends of one of the wheel-bearing rails in the special section; and (2) the insulation of that rail from the metal ties. The effect of this construction is to create a "dead rail section" in one of the wheel-bearing rails, so that when wires are connected from the operative device to that dead rail section, and also to the central or "third" rail, and the train is running, a "shunt" or "parallel" circuit is set up independent of the circuit for the engine motor. This shunt circuit permits the operation of the motor of the engine, even though the operative device may be disconnected, and vice versa.

Claim 2 of the patent is for a part only of the Handy construction. It calls for a track section with three rails and connecting ties, and with each of the three rails insulated from the other rails of the section, one of the rails having open ends with insulating connecting pins. Claim 5 calls for an "article of manufacture," consisting of a "unitary track section" interchangeable with a regular track section, and permitting the simultaneous operation of a train and an electrically operated signal, or the like. It defines the electrical relation of the three rails of the "unitary" section, including the insulation end-wise of one of the wheel-bearing rails of that section from the corresponding rails of the adjacent sections. Claim 3 calls for a complete system as constituted after "the article of manufacture" of claim 5 is in place in the system. It includes the source of current connected to two of the rails of the special section, a "dead" rail in the special section, and an "electrically operable device" in circuit with one of the live rails and the "dead" rail.

Handy completed his invention in December, 1919. He made his first sketches in January, 1918, and they were all dated, signed, and witnessed. These sketches were produced at the trial, and bear no marks of doubtful authenticity. About Christmas, 1919, Handy embodied his invention in an old toy track system he had used in previous years. In order to accomplish this, he reconstructed a section of his old track by insulating the rails with paper and inserting insulating pins at the ends of the "dead" rail. He also made an operating semaphore and a crossing-gate. Then the special track section, as reconstructed, was fitted into the existing system, and the operating devices were attached by wires, and the whole system worked. Many of Handy's friends and neighbors saw the system with the devices in operation on Christmas of 1919, and a number of them have testified at the trial. I have no doubt, therefore, that Handy reduced his invention to practice in December, 1919. Nor do I think that this date is to be discredited by his subsequent statement in the interference proceedings, in which he claimed December, 1920, and not December, 1919, as the date when he completed his invention. This statement was clearly an inadvertent error on Handy's part, and it has been satisfactorily explained in such a way as completely to straighten out the record.

During the Christmas period of 1920, Handy again set up and operated his toy track system with the special section and the operating devices shown at Christmas the previous year. Later in December, 1920, a description of the invention, with an accompanying sketch, was prepared, and, on December 30, 1920, Handy wrote to a patent attorney in Washington, inclosing the description and the sketch, and requested that the Patent Office records be examined to ascertain if the idea was patentable. Subsequently, and on March 16, 1921, Handy wrote the Lionel Corporation, one of the plaintiffs in this action, inclosing a photostatic copy of the patent drawing of the special track section, and a description of the invention, and asking if they were interested in acquiring the rights of the invention. These papers were returned by the Lionel Corporation March 24, 1921, with a statement that they did not "see anything of interest in the specifications." Yet, in May, 1921, the Lionel Corporation commenced to advertise for sale a special track section identical with the Handy section, and about July, 1921, this special section first appeared in the regular

Lionel catalogue, deliveries to customers being made in September, 1921.

The appearance of the Lionel special section prompted Handy to file his patent application on November 19, 1921, but it was not until July 19, 1927, that the patent actually issued.

In the meantime, and in February, 1922, the defendant commenced advertising the infringing structure for sale. This structure is a complete replica of the Handy section, and has been sold by the defendant continuously since 1922.

At the trial, the defendant insisted that it secured nothing from Handy; but it is difficult to avoid the conclusion that the appearance on the market of the Handy section, as manufactured by Lionel in 1921, was what prompted the manufacture and sale of the infringing structures by the defendant in 1922. This inference is particularly compelling, inasmuch as the American field for the manufacture and sale of toy tracks was very narrow in 1922; and obviously each manufacturer was fully informed of the competitive lines of his rivals. I see no reason to doubt, therefore, that the defendant copied the Handy construction.

■■ Did it have a right to do so? The defendant contends that it did, because, as asserted, Handy merely applied well-known general principles, and produced nothing new in the art. But that is a familiar defense to every meritorious invention. And, as stated by Judge Hough in Kurtz v. Belle (C. C. A.) 280 F. 277, 282: "Hindsight, or wisdom after the fact, has always been looked upon with disfavor" in passing on the validity of patents. There are no fixed rules for determining invention. It is "to be decided on the evidence," and the question of infringement "may 'be answered differently by persons of equal intelligence.'" Kurtz v. Belle, supra, page 281 of 280 F. "Simplicity," "cheapness," "utility," "commercial success," and "prior unsuccessful experimentation" are among the "canons of decision" indicated by the courts. Kurtz v. Belle, supra; Smith v. Goodyear, 93 U. S. 486, 23 L. Ed. 952; Maitland v. Goetz (C. C. A.) 86 F. 124; Frost v. Cohn (C. C. A.) 119 F. 505; National Hollow Brake-Beam Co. v. Interchangeable (C. C. A.) 106 F. 693. And the citation of many prior art references, none showing a solution of the problem presented, is persuasive evidence of invention. Scott v. Fisher (C. C. A.) 145 F. 915, 916; Forsythe v. Garlock (C. C. A.) 142 F. 461, 463. Measured by these standards, the Handy arrangement, although not entitled to a broad scope, discloses invention.

■ The defendant's expert, Boyle, asserted that the Handy construction had two features, "the insulating and the signal circuit," by which he meant the use of the insulating pins in the ends of the rails and the "shunt" or "parallel" circuit. He was frank to admit, however, that he could find no single device in the prior art which had these two features. His closest reference among the prior art patents was the German patent to Chill, No. 326759. This patent bears an "Ausgegeben" date of October 2, 1920, and is, therefore, not available as an anticipation of the Handy invention which was completed in December, 1919. Merrell-Soule Co. v. Powdered (D. C.) 216 F. 922, 928.

It is nevertheless instructive as showing that a contemporary worker with Handy, seeking to accomplish the same results, completely failed in his efforts. The patent relates specifically to toy railways of the three-rail type, and shows a propulsion and a signal circuit similar in some respects to Handy's circuits. The device is, however, entirely different from Handy's section, and has none of Handy's advantages in its ready application to a standard system without troublesome adjustment or alteration.

Chill shows a central rail with a "dead" portion d separated by air gaps at either end, and with a conductor wire bridging the dead portion and connecting the two end portions. An air gap e is also disclosed near the middle of the wheel rail c, and serves as an insulation of that portion of the rail. There is, however, no insulation at each end of any one of the rails of the section, thus admittedly making it impossible for a single section of Chill to be placed in a regular three rail system so as to operate in the same way as will a single section of Handy.

The Theofolis patent, No. 1382691, is also open to objection as a reference, inasmuch as the application was not filed until April 19, 1920, or subsequent to Handy's reduction to practice in December, 1919. This patent shows a signal in a "shunt" circuit operating somewhat the same as the Handy arrangement. The defendant's expert, Boyle, testified, however, that "in Theofolis the insulated section and the rail are made in two pieces, separate from each other; whereas, in the Handy patent, the insulated rail and insulated section are one." Boyle was referring in this testimony to a supplemental bar 17 extending along the inner side of the track rail to which the signal was connected. This ar-

rangement is radically different from Handy's, where a portion of the track rail is utilized as a dead section. I am clear, therefore, that Theofolis does not have the Handy construction or method of operation.

The patents to Balzer, 1097160, Hummel, 1153922, and Heiberg, 1165232, are concededly farther removed from Handy than Chill and Theofolis; and it will be sufficient for the present purpose to say that they have been examined, and contain nothing invalidating the Handy patent.

The defendant has also referred, as part of the prior art, to the practice of railroad signaling on the steam and electric railroads of the country. The system of the Boston Elevated Railroad, as described in the Railway Signal Dictionary (2d Ed.), published in 1911, is cited as a typical illustration of the prevailing practice on these roads. I find, however, little similarity in the arrangement of the two systems. The circuit of the standard railroad is a "normally closed circuit," whereas, Handy's circuit is of the "normally open type." Furthermore, the system of the Boston Elevated Railroad had separate sources of energy for the motor and signal, instead of one source for both motor and signal, as with Handy.

Reference is also made to part of a book printed in 1910, entitled "Railway Signalling," showing the "principles of operation" of "normally closed track circuits" for three-rail systems, and "normally open circuits" for two-rail systems. Manifestly, these citations have little bearing on the questions presented in this case, except to emphasize the fact that the problems confronting toy track manufacturers are far removed from those encountered in the operation of standard railroads.

Finally, the defendant strongly urges that its own experience and practice in the manufacture and sale of toy tracks fully disclosed the Handy invention. Originally, the defendant manufactured a two-rail track, and, in order to light the locomotive, insulated one of the wheel rails of one of the sections from the other wheel rail, and connected a battery directly to that dead portion of the rail. This necessitated a specially constructed locomotive, due to the fact that the wheels had to be insulated from each other; otherwise there would have been a short circuit from one wheel to the other through the axle, and the lamp would not have lighted.

Then for some years commencing in 1915, the defendant manufactured and sold to the department of railway signaling in Chicago, for educational purposes, a two-track system, in which a wheel rail of one section was insulated at its ends with wooden pins, and also from the other wheel rail, a battery being connected to this dead rail portion and to the other wheel rail. There was also a lamp in circuit with the battery, which was lighted by the passage of the train. The operation of this two-track system is fully explained in a manual entitled "Course in Railway Signal Engineering for Steam and Electric Railways," copyrighted in 1914, and used by the department of railway signaling in its work with its students.

This manual contains the following at pages 121 and 129:

"The student will notice that the track furnished with the outfit differs in many respects from the track met with in actual railroad work. The most important difference, however, is that it has metal ties, while the track used in actual work has wooden ties. Wood, when dry, is a very satisfactory insulator. Thus, in actual work, the rails being spaced 4 feet $8\frac{1}{2}$ inches apart, by means of wooden ties, are pretty thoroughly insulated from each other. As we are unable to obtain such track with wooden ties, it is therefore necessary to insulate one rail from the other on your miniature track. There are several ways of doing this, one of which is to cut the tin ties in two with a heavy pair of shears and then tack each rail down separately. A somewhat better method is to bend up the tin clips on the ends of the ties and insert pieces of paper or thin cardboard between the ties and the rails. Great care must be taken in doing this, however, or the tin clips will be broken off.

"The insulated joints at the ends of the track sections may be made by removing the wire nails from the ends of the rails and replacing these nails with matches or other nonconductors. In telescoping the rails together at the insulated joints allow about one-eighth of an inch of space between the successive rails."

"The rails J and K in the track section between the insulated joints must be insulated one from the other, by means of pieces of paper placed between the ties and rails, as previously explained. The insulated joints A and D are to be made of matches in place of the wire nails in the ends of the rails."

The system manufactured for the department of railway signaling, and described in its manual, may be distinguished from Handy's, in that it is not a three-rail system, and the circuits are not in parallel. Furthermore,

the source of current must be near the special section, or else a long wire must be used to connect the source of current with the special section. With Handy, on the other hand, the special section, or a number of special sections, can be injected into the system at any point or points, regardless of the place where the source of current is connected to the track rail. Manifestly, this flexibility of use and operation is a decided advantage in the way toy tracks are handled by the average small boy.

Later, and between 1912 and 1914, the defendant used in its two-rail track system a special section consisting of a section of a three-rail track of foreign manufacture. In this arrangement, the central rail of the three-rail special section had air gap insulation at the ends, but there were no wooden pins at the ends of the rail tracks. The battery was connected to one of the track rails, and to the dead central rail of the special section, and the light placed in the circuit thus created. This arrangement was only a makeshift, and had the defects of the earlier two-rail arrangement, particularly in requiring the location of the source of the current at the special section.

It thus appears that, on an examination of the prior art, nothing has been shown to invalidate the patent. Unquestionably, all of the elements of the Handy construction may be found somewhere among the many references cited by the defendant. But Handy was the first to combine these different elements into something new, which produced a different and a better result than had previously been known. The art was a crowded one when Handy entered the field, and others were then at work on the same problems he was attempting to solve. Yet, where others failed, Handy succeeded; and today his special track section is in general demand in connection with the operation of toy electric trains, and has attained a fair measure of commercial success. I think his advance constituted invention, and I find that claims 2, 3, and 5 are valid and infringed.

I have not undertaken to examine the file wrapper because I do not feel that any adequate reason for such examination has been suggested under the prevailing practice in this circuit. Spalding v. Wanamaker (C. C. A.) 256 F. 530, 534. I do not think, either, that the use of Genzlinger's name in the correspondence with the Lionel and American Flyer companies in 1921 and 1924, respectively, has in any way prejudiced the patent. Unquestionably, Genzlinger was not the inventor, but Handy was; that is the uncontradicted testimony of both Genzlinger and Handy, and it is not open to the defendant to assert to the contrary. The incident proves nothing, except that Handy was guilty of an indiscretion, which did no one any harm, and which has now been adequately explained.

The plaintiffs are, therefore, entitled to a decree declaring claims 2, 3, and 5 of the patent valid and infringed, and directing the usual reference.