### VEGETABLE OIL PRODUCTS CO., Inc., v. DORWARD & SONS CO. et al.

#### No. 21920.

District Court, N. D. California, S. D.

Dec. 9, 1943.

[1] Everhart v. Dolf, 1890, 133 Pa. 628, 642, 19 A. 431, 432.

Faries & McDowell and C. A. Miketta, all of Los Angeles, Cal., and Naylor & Lassagne and James M. Naylor, all of San Francisco, Cal., for plaintiff.

Wm. M. Maxfield and Henry Gifford Hardy, both of San Francisco, Cal., for defendants.

GOODMAN, District Judge.

Vital to a proper understanding of the issues involved in this patent infringement suit is the story of the relationship between the parties to the controversy.

In 1933, plaintiff corporation, whose business, among other things, is to treat, manufacture and sell vegetable and marine oils, employed, at its Los Angeles plant, one Otho M. Behr, as its chief paint chemist. Behr, a graduate of the University of California, and a research chemist experienced in paint oils, devoted himself, while in plaintiff's employ, to the development of fast drying paint oils from vegetable and marine oils. To develop a formula for fast drying oils has long been the aim of industrial chemists. Defendant Dexter, a young man of no particular experience or knowledge in this field, went to work for plaintiff in 1936 as a helper to Behr and one Holmes, plaintiff's chief chemist. Behr instructed Dexter in methods and techniques. Dexter assisted Behr in experiments for the production of fast drying oils. In this work Behr freely discussed procedures with Dexter, who had access to all records, equipment and data.

As a result of study and tests, Behr, as inventor, filed application for patent No. 2,166,103 (the first of the two patents in suit) on May 10, 1937. Experiments continued and on October 21, 1938, Behr filed application No. 2,239,692 (the second patent in suit). Meanwhile Dexter had become production manager of the Paint Oil Department of plaintiff.

Early in September, 1938, defendant Dexter interviewed Dave and Fred Dorward, executive officers of defendant corporation. On September 15, 1938, defendant corporation, by letter, employed Dexter. On September 20, 1938, Dexter wrote

defendant corporation that he would not start work until October, but he said: "although I thought there would be no delay, that delay may be made to serve to good advantage as there are much data to organize and many ideas to sketch" (Plaintiff's Exhibit 7). So in October, 1938, Dexter went into the employ of defendant corporation.

On July 18, 1939, Behr's first patent issued. Almost immediately after the public disclosure of Behr's process, Dexter began the construction for defendant corporation of a plant to manufacture the same kind of drying and non-drying oils, then being produced by plaintiff through the use of the Behr processes. Within six months, defendant corporation's equipment was completed and since then it has been producing and selling large quantities of drying and non-drying paint oils.

There is evidence to the effect that other employees of plaintiff subsequently found their way to the Dorwards. There is no doubt whatsoever that Dexter turned over to the Dorwards and they received the full benefit of all he learned while employed by plaintiff. He was able to start work, immediately after the issuance of Behr's first patent, without preliminary study or experimentation, upon the construction and erection of equipment to manufacture oil pursuant to the Behr Process.

On April 29, 1941, Behr's second patent issued.

Plaintiff, the owner of the two Behr patents, brought this action for (1) infringement of the two Behr letters patent and (2) damages for conspiracy of Dexter and defendant corporation to obtain, utilize and pirate the confidential information acquired by Dexter while in plaintiff's employ.

From the very beginning, this has been a bitter controversy. Charges and counter-charges have thickened the legal atmosphere. In the pleading file alone are 98 separate documents. The trial consumed 14 full trial days. The transcript consists of 1275 pages and 75 exhibits were introduced—many of them in numerous subdivisions. Innumerable experiments were conducted in the court room. On submission of the cause, counsel submitted a total of 417 pages of briefs. What I have said is not by way of complaint as to the burden upon the court. It only serves to emphasize the plaint of many a judge, that in endeavoring to do justice in difficult and complex patent litigation, the court can only "divine" the truth and then at best exercise an "arbitrary" judgment. Kirsch Mfg. Co. v. Gould Mersereau Co., 2 Cir., 6 F.2d 793; Hydraulic Press Mfg. Co. v. Ralph N. Brodie Co., D. C., 51 F.Supp. 202, 204.

### Validity of Patents.

The patents in suit have to do with a process for the treatment of vegetable and marine oils for the purpose of converting them into products of great value in the paint, varnish and lacquer industry and of quality greatly improved over the starting oils. By way of example, by Behr's process, a sardine oil, which is a semi-drying oil, is converted into a rapid-drying liquid paint oil. There can be no question but that, for decades before Behr, efforts had been made to improve the quality of paints and varnishes and of the various types of oil used therein. The development of a quick-drying paint oil had always been one of the main objectives. The elimination of fatty acids in oil had been a condition precedent to the accomplishment of this end. The old fashioned and orthodox method had been to boil the starting oil. Other methods of treatment of the oil to accomplish the same result had been to wash in alcohol or treat with alkali. None of these methods, however, had to any marked degree accomplished rapid drying.

In patent No. 2,166,103 (the first patent in suit) the inventor states the object of the process to be: "The present invention is primarily directed toward a process whereby a semi-drying oil (or any oil containing saturated, partially saturated and unsaturated compounds) may be treated to produce two separate and distinct liquid products, each of these products having properties which render it eminently suited for use in a separate and distinct field. A fish oil such as sardine oil, for example, may be converted in accordance with the process of this invention into two fractions, one of which is eminently suited for use in paints, varnishes and the like and has all of the valuable properties of a splendid drying oil such as China-wood oil, for example. Whereas the other fractions or products is eminently suited for use either as an edible oil or for hydrogenation, saponification or the like."

Another object is stated to be: "Another object of this invention is to disclose and provide certain new and useful improve

drying oils and methods of producing the same."

Still another object is stated to be: "A further object of the invention is to disclose and provide a method of manufacturing drying oils which are more waterproof, much harder drying and faster drying, and much more readily and completely polymerized upon further treatment than normal drying oils."

Of the eight claims asserted in the first patent only claims 3, 5, 6 and 8 are relied upon.

For the purpose of determining the issues presented, claim 3 sufficiently sets forth the steps and objectives of the process and reads as follows: "A method of treating vegetable and marine oils to recover therefrom oil fractions having enhanced drying properties, comprising: subjecting the oil to an incomplete polymerizing treatment virtually insufficient to form solid gels, the partially polymerized oil being capable of exhibiting a drop in iodine value upon further heat-bodying; mixing said partially polymerized oil with not less than three volumes of an organic solvent from the group of ketones and higher alcohols; separating the mixture gravimetrically into two layers of solution of oil and solvent, recovering a liquid oil fraction having enhanced drying properties from one layer and recovering an oil fraction having non-drying characteristics from the other layer."

Upon the meaning of the expression "partially polymerized oil," according to defendants, substantially depends the validity of the patents. Upon analysis, this term is not as formidable as it sounds. Polymerization really means a fusing or joining together. When a vegetable or marine oil is heated, certain of the molecules fuse, and, by that process, form larger and structurally more complex bodies than existed prior to the application of the heat. These are polymerids. Continued application of heat results in larger and still larger bodies developing from the fusion, until, if the process is continued without restraint, solid or semi-solid bodies are formed which are called gels. The claim of the inventor is that at a certain stage of the heating process the starting oil is ready for joining up with other steps of the process. That stage is described in Claim 3 as being the point at which polymerization or fusion has not taken place to such an extent as to form solid gels and at which the oil can have a further drop in iodine value if heated further. When this state has been reached, the oil in the so-called partially polymerized or fused state is then mixed with solvent. Thereupon, the mixture separates gravimetrically into two layers: from one layer is recovered oil which has enhanced drying capacity and from the other layer, oil is recovered in which the drying qualities are absent. The oil having the drying qualities is suitable for, and is valuable in paints, lacquers and varnishes. On the other hand, the oil having non-drying characteristics is edible or suitable for other domestic purposes.

The process described in the first patent (No. 2,166,103) is a so-called "batch" process, i. e., only a fixed amount of oil is processed at one time.

In the second patent in suit (No. 2,239,-692) the inventor sets up a procedure for the continuity of the steps making up the "batch" process. By it, additional oil and the same solvent may be utilized. Continuous production results.

■ There is no doubt that a process, such as is here involved, possesses patentability. A process has been defined as a series of acts or steps performed upon the subject matter to be transformed and reduced to a different state or thing. Cochrane v. Deener, 94 U.S. 780, 788, 24 L.Ed. 139. Behr's patents provide for a series of steps and the question is whether that series or combination of steps is new and therefore patentable.

Some contention is made by defendants that this process is nothing more or less than a law of natural science and therefore is not patentable. True, the process makes use of and applies laws of natural science. Processes applying the laws of nature or of the natural sciences have always been considered subject to patent. Sewall v. Jones, 91 U.S. 171, 23 L.Ed. 275. Behr did not discover a "scientific certitude"; rather as a result of a "scientific certitude", he formulated a novel process.

■ In a consideration of the validity of these patents, the starting point is the presumption of validity resulting from the granting of the letters patent. Radio Corporation v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163; J. A. Mohr & Son v. Alliance Securities Co., 9 Cir., 14 F.2d 799.

■ There is no doubt in my mind that Behr made a useful discovery. His testi-

mony and that of Mr. Bush, an expert witness produced by plaintiff, convinced me that the steps in this process in combination make it possible to meet a long unsatisfied need in the paint and varnish industry. True, much experimentation and investigation in the general subject matter had been going on for many years. Some of the steps described in the Behr patent had been theretofore discovered. Many experiments had been made and considerable literature written upon the subject. However, up to the time of Behr, no one had aggregated the necessary steps into a process possessing a new utilitarian function. Such is the basis of patentability here. Wire Wheel Corp. v. Madison Motor Co., D.C., 267 F. 220, 222; Bates v. Coe, 98 U.S. 31, 48, 25 L.Ed. 68.

■ The evidence showed that plaintiff corporation expended large sums of money during a period of years in aid of Behr's exploratory labors. Substantial quantities of drying and non-drying oils were manufactured by the plaintiff as a result of the use of the process. The drying oils were marketed under the designations: "Thermoil" or "Thermoil A". The non-drying oils were sold under the name: "S–32." License agreements were entered into and the licensees thereunder have produced and sold on the market considerable quantities of the products realized from the application of the process. While a clear lack of novelty cannot be overcome by evidence of commercial success (Celite Corporation v. Dicalite Co., 9 Cir., 96 F.2d 242), there is no doubt that commercial success is persuasive in support of the validity of a patent when there are other legal indicia of novelty present. Research Products Co. v. Tretolite Co., 9 Cir., 106 F.2d 530.

■ In their answer, defendants alleged 36 patents and publications to be anticipatory of the Behr patents. At the trial, upon prodding by plaintiff's counsel, the number was reduced to 19 and the evidence limited thereto. Even so, this is a large number of anticipatory patents and publications upon which to rest this defense. In itself this is persuasive of the futility of prior attempts to solve the problem. Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 917; Scott v. Fisher Knitting Mach. Co., 2 Cir., 145 F. 915, 916; Handy v. American Flyer Mfg. Co., D. C., 44 F.2d 633, 635.

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any * * *," said Mr. Justice McKenna in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527.

■■ The rule is too well known to require citation that there is a heavy burden of proof upon the party asserting patent invalidity. It is also unnecessary to cite authorities as to the rule of "proof beyond a reasonable doubt." This latter rule does not seem to me to be invoked as often as it should be in patent infringement cases. Certainly, in view of the defendants' activities, no easy way should be opened for a relaxation of the rule imposing upon them the burden of proof "beyond a mere preponderance of the evidence."

After listening to the testimony of the various witnesses and observing the experiments performed in the court room, I am satisfied that none of the patents or publications urged by the defendants as anticipating the plaintiff's invention disclosed the essential combination of steps projected in the patents in suit. Parks v. Booth, 102 U.S. 96, 26 L.Ed. 54; J. A. Mohr & Sons v. Alliance Securities Co., supra; Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 31 F.2d 427.

The testimony of Mr. Bush, a man of wide and long experience in this field, and, particularly, his analysis of the claimed anticipatory patents and publications as set out in plaintiff's Exhibit No. 37, fully convinced me in this regard.

■ Having in mind that there are no fixed rules for determining invention, I have applied the orthodox "canons of decision". Handy v. American Flyer Mfg. Co., supra. Judged thereby, I find in favor of the validity of the letters patent here in suit.

### Infringement.

Plaintiff commenced to manufacture and sell "Thermoil" and "S–32" in 1938 and continued thereafter, either itself or through licensees, to follow the same course. Defendant corporation, after completing its equipment, began early in 1940 to treat oils in accordance with the Behr process. Some modifications in process took place in July 1941 and thereafter it went into regular production.

Its drying oils were marketed under the designation of "Dorscolene S" (sardine base) and "Dorscolene L" (linseed base.)

The non-drying oils were designated "1040" (sardine base) and "1044" (linseed base).

Defendant's products are in direct competition with plaintiff. Prior to 1940, defendant corporation did not have the equipment for, nor did it manufacture, drying oils having the properties of Dorscolene.

Does defendant corporation employ the same starting ingredients specified in the Behr patents? Does it take the same steps? Are the steps taken for the same purpose, and does it produce a like product? If it does, it infringes. The evidence fully convinces me that it does.

Defendant uses oil heated to the point specified by Behr.

It uses the same solvent.

It performs the mixing or contact between oil and solvent as taught by Behr.

It withdraws two solutions as described in the process.

It obtains two separate liquid products from the solution.

The properties of the two liquid products are substantially the same as those produced via the Behr procedure.

Thus all the criteria necessary to establish infringement are met. Hoeltke v. C. M. Kemp Mfg. Co., supra; Cantrell v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017.

Defendant corporation uses somewhat different manufacturing equipment than that employed by plaintiff. This is immaterial. Only infringement of process is here involved. Union Oil Co. of Cal. v. American Bitimuls Co., 9 Cir., 109 F.2d 140. Electro Bleaching Gas Co. v. Paradon Engineering Co., 2 Cir., 12 F.2d 511; Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139.

Some insubstantial departures in procedure are evident in the formula used by defendant. This also may not be availed of to avoid infringement. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147. Such a defense is too technical. Hinman v. Visible Milker Co., 2 Cir., 239 F. 896.

As to the second patent, defendant claims and its amended statement of process indicates, an intermittence of sorts in the operation of its equipment—an intermittent continuity.

At most, this indicates that Dexter may not have absorbed a perfect understanding of the process from Behr. It more persuasively proves, rather than avoids, defendants' culpability. Reitzsch v. Paradis, 3 Cir., 83 F.2d 273.

The necessary formal proof of sales of defendant's "Dorscolene," both prior and subsequent to July, 1941, was made (Dorward deposition 56, 58, 66, 71, 72.)

Plaintiff seeks relief in the first cause of action (infringement) against Dexter as well as defendant corporation. Dexter, at the time of infringement, was an employee of defendant corporation. Plaintiff contends, nevertheless, that Dexter's acts amount to a personal affirmative misfeasance on his part and that he should be enjoined from ever again, in any capacity, promoting or participating in any infringing acts. However, in the absence of any threat of future infringement by Dexter, there is no need for equitable relief as against him.

It is not necessary to pass upon the merits of the second cause of action, inasmuch as the judgment herein gives proper relief for the wrong complained of.

Judgment will go for plaintiff and against defendant corporation for an injunction, for an accounting of profits and damages and for costs of suit. Findings may be submitted in accordance with the rules.