RIC–WIL CO. v. E. B. KAISER CO.

No. 9755.

United States Court of Appeals
Seventh Circuit.

Jan. 5, 1950.

As Modified on Denial of Rehearing
March 1, 1950.

George I. Haight, Chicago, Ill., Carl Hoppe, San Francisco, Cal., Edward A. Haight, Robert R. Lockwood, Chicago, Ill., for appellant.

Harvey R. Hawgood and Arthur H. Van Horn, Cleveland, Ohio, Will Freeman, Paul Gallagher, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

This is an appeal from a judgment entered October 19, 1948, holding certain claims of four patents, owned by the plaintiff, valid and infringed by the defendant. All of the patents relate to a conduit system and its improvements adapted to be used in the transmission of steam and other liquids. The apparatus described, together with the improvements, is particularly designed for use in connection with a central heating system whereby heat is generated at a common point and transmitted, usually by underground pipes, to the place of utilization.

The patents in suit are: No. 1,991,455, issued February 19, 1935, to C. Gottwald. This is the basic patent, the subject matter of which is unit pipe construction. Claims 11, 14, 15, 16 and 17 are relied upon. No. 2,050,968, issued August 11, 1936, to C. Gottwald et al. The subject matter is a plate guide. Claim 2 is relied upon. Reissue patent No. Re. 22,988 (based on original patent No. 2,360,067), issued March 16, 1948, to W. S. McLeish. The subject matter is an anchor. Claim 1 is relied upon. No. 2,378,214, issued June 12, 1945, to C. Gottwald. The subject matter is a hairpin expansion device. Claims 1, 5 and 6 are relied upon. The last three named patents are for devices designed as an improvement upon the first named. All of these patents are owned by the plaintiff company, of which C. Gottwald is president.

The first named patent shows a steam pipe surrounded by a layer of insulation and having an outer covering or shell to protect the insulation, with an air space between the insulation and the shell. The combination is assembled in a factory, thus providing a unit construction with the ends of the pipe extending beyond that of the insulation and shell to facilitate handling and joining the units together to make up a steam piping system. The claims in suit of this patent are directed to this unit in its use in the piping system. The second named patent has to do with spacing the steam pipe from the outer shell. It shows a number of forms of spacing devices designed to hold a pipe within a conduit so as to prevent moving toward its top or sides. The steam pipe extends through a hole in the plate referred to. The third named patent shows a steel plate with a hole in it for the steam pipe to which the plate is welded. This plate is referred to as an anchor and is designed to serve as a means of holding a conduit by anchorage. The fourth named patent, referred to as a hairpin patent, shows a device for taking care of expansion and contraction of the insulated steam pipe.

The main contested issue here, of course, is the court's holding of validity and infringement. Other issues raised by the defendant, we think, are of a minor nature and will be subsequently stated and considered insofar as we think they are of significance. The court below heard the testimony of numerous witnesses, as well as documentary evidence. The latter consisted in the main of some 135 patents previously issued, some 100 of which were offered, so it is asserted, to show the state of the prior art, and some 35 as anticipatory of some or all of the claims in suit. Thereupon, the court made detailed findings of fact and conclusions of law, upon which its judgment of validity and infringement was predicated.

It was shown that for many years central heating systems had been used but that their use was much restricted by the laborious and costly pipe-line installations and the best that had been developed up to about 1930 was the ceramic "Tunnel-Type" system in which the steam pipe, together with the installation, was installed in a partly finished masonry tunnel lining structure in the bottom of a trench and the subsequent completion of this lining structure, after which it was buried by filling

in the trench. The installation of such systems was limited because of the high installation expense due to the large amount of excavation required, expensive materials and the high cost of skilled labor, particularly in the masonry trades. Other disadvantages were the inconvenience to property owners adjacent to the installation, the disruption of traffic and the likelihood of breakage of ceramic and similar materials which were difficult to repair and replace.

The patentee Gottwald for a period of many years endeavored to improve the "Tunnel-Type" system, in which field he made progress as is evidenced by his patent No. 1,681,731. This was all prior to his development of the "Unit-Type" construction embodied in the patents in suit. With all the improvements, however, made in the "Tunnel-Type" system, it was still necessary to build the lower half of the masonry structure in the bottom of the trench, install the pipe, insulate it, build the top half of the liner over it and fill in the trench, and the most desirable liner or covering for the structure then known was ceramic tile which, while more easily handled than brick or concrete, was subject to breakage in handling, during installation and after completion. Gottwald as a witness related his effort to learn of materials which would make it possible to do much of the construction work in a factory at a point away from that of installation. He experimented with known materials and new materials as they were developed in an endeavor to find something which could be used in combination with a steam pipe. He selected corrugated steel culvert material such as was then manufactured by the American Rolling Mills Company as suitable for one element of the unit, namely, the covering or outside shell. After selecting this element he was faced with the problem of combining it with the steam pipe so that they would remain properly located relatively during handling and installation, and also so that heat insulating material could properly be applied and handled during these operations. As a result of these efforts, he developed the "Unit-Type" construction disclosed in his patent No. 1,991,455.

That the disclosure represented marked advancement in the construction and insulation of a steam heating system can hardly be doubted from this record. Here for the first time was a unit which could be completed indoors, affording workers protection in all kinds of weather and thus increasing their efficiency, and insuring a better quality product. It was capable of being transported complete, lowered into a trench substantially no larger than sufficient to receive it, could be coupled with other units quickly and accurately in which the joints could be tested and inspected immediately after they had been made, and the trench could at once be filled. The required depth of the trench was also decreased because of the metal covering employed, which enabled the conduit to resist heavy loads and shock. The designed structure obviated the necessity of keeping the trench open while the lower half of the shell was being laid and until the cement or concrete used in its construction had set—generally several days—and then keeping it open while the pipe was laid in the bottom portion of the shell and heating insulating material applied to it, and, further, keeping the trench open while the upper half of the shell was completed and waiting until that part of the shell had an opportunity to set.

It thus became possible not only to dig a smaller trench but immediately to follow by laying units as fast as there was space prepared for them, to connect and test these as they were laid, and to refill the trench immediately as the connections were made. After installation, the strength of the "Unit-Type" eliminated breakage such as had occurred with the "Tunnel-Type" of construction, and if for any reason a section needed to be replaced the old section was as readily removable as it was installable so that maintenance costs were reduced both by cutting down on breakage and a saving in labor. There is undisputed evidence in the record that the "Unit-Type" structure reduced the amount of earth which had to be excavated to

38% of what had formerly been required, that it eliminated substantially all breakage, permitted installations without interruption of traffic, and increased by four times the speed with which conduits could be laid. And it was shown that the "Unit-Type" conduit of the patents in suit has largely taken the place of the older "Tunnel-Type." The former type represents some 85% of plaintiff's business and 100% of defendant's business. Plaintiff manufactured 4,500,000 feet (852 miles) of "Unit-Type" construction in about seven years.

While the question of infringement by the defendant is much controverted here, a study of the record is convincing that in the court below the main issue was that of validity. The issue of infringement was relegated to an extremely minor position. In fact, defendant's expert witness as to patent No. 1,991,455 expressly admitted that defendant's structure was an infringement of claims 11, 14, 15 and 16, although at a subsequent time in his testimony he withdrew his admission as to claim 11.

Plaintiff is in the fortunate and we think unique position which enables it to call to its aid in support of the judgment below many principles recognized as indicating patent validity. First, there is the presumption of validity which attaches to the patent grant. Second, the court below, on oral and documentary proof, made detailed findings of fact which are, under Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A., binding on this court unless clearly erroneous. Both of these propositions are so well recognized as to require no citation of authority. Third, it is shown that the problem which confronted the central heating industry was first solved by the disclosures of the patent in suit or, at any rate, its progress was immeasurably advanced over anything which had been before relied upon. It has been held that prior art patents under these circumstances do not anticipate. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968; Detroit Motor Appliance Co. v. Burke et al., D.C., 4 F.2d 118, 121; Atlantic, Gulf & Pacific Co. v. Wood, 5 Cir., 288 F. 148; Babcock & Wilcox Co. v. Springfield Boiler Co., 2 Cir., 16 F.2d 964. Fourth, we have already made reference to the excessive number of prior art patents offered by the defendant. If 135 such patents are required to show the state of the prior art, it must have been in a highly uncertain and confused state. And it has been held that the excessive number of such references is in itself persuasive of the futility of prior attempts to solve the problem. Ball & Roller Bearing Co. v. F. C. Sanford Mfg. Co., 2 Cir., 297 F. 163; Vegetable Oil Products Co., Inc. v. Dorward & Sons Co., et al., D.C., 53 F.Supp. 281, 285; Kryptok Co. v. Stead Lens Co., D.C., 207 F. 85. Fifth, that defendant's alleged infringing structure was designed in the main in conformity with the disclosures of the patents in suit can hardly be doubted. The prior art upon which defendant now lavishes its praise was apparently permitted to lie dormant until the exigency, created by a suit for infringement, required its resurrection. Defendant's imitation of the patent structure is another indication of invention. Kurtz et al. v. Belle Hat Lining Co., Inc., 2 Cir., 280 F. 277, 281; Fones v. American Specialty Co., D. C., 38 F.2d 639, 642; Gairing Tool Co. v. Eclipse Interchangeable Counterbore Co., 6 Cir., 48 F.2d 73, 75; Sandy MacGregor Co. et al. v. Vaco Grip Co., 6 Cir., 2 F.2d 655, 656. And lastly, plaintiff's success in a field where others had failed is an indication of invention. Carr Fastener Co. v. Magnus & Easterman Co. et al., D. C., 46 F.2d 333; Trane Co. v. Nash Engineering Co., 1 Cir., 25 F.2d 267; Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 324, 48 S.Ct. 170, 72 L.Ed. 298; Root Refining Co. v. Universal Oil Products Co., 3 Cir., 78 F.2d 991, 994. The principle that commercial success cannot be used to create a doubt and then to resolve it in favor of validity appears to be without application here.

At this point, we mention defendant's contention that the holding of validity of the claims in suit was the result of the court's reasoning as shown in paragraphs 8 and 9 of the judgment, wherein it was stated:

"8. That the defendant admitted producing the various infringing structures and based its defense solely on the prior patented art and therefore assumed the burden of establishing its defense by clear and convincing testimony.

"9. That the defense offered consisted solely of the references cited and the uncorroborated testimony of Wilbur Fiske Kellogg who is neither a member of the bar nor a registered professional engineer, and, therefore, is not qualified to testify either as to the legal effect or the engineering aspects of patents, and whose testimony moreover was inconsistent within itself and contradictory to established facts; and that the defendant has therefore totally failed to sustain the burden of proof upon it."

No authority is cited in support of defendant's argument in this respect. The defendant's reliance upon the prior art to invalidate the claims in suit we think placed upon it the burden of overcoming the presumption which accompanied their allowance. We doubt, however, the soundness of the statement in paragraph 9 that defendant's expert witness Kellogg was not qualified to testify either as to the legal effect or the engineering aspects of patents because he was not a member of the bar or a registered professional engineer. We think that such handicap would go to the weight or credit to be attached to his testimony rather than his qualification. It is difficult to discern, however, how defendant was harmed by the statement complained of, because the fact is that this witness was not disqualified to testify but was permitted to do so in detail concerning the claims in suit, as well as the prior art patents, and that the court considered and weighed such testimony. As a result the court found, "The testimony of the witness Kellogg is not consistent within itself, and is contradictory to an established fact," that "The testimony of the witness Kellogg is not corroborated in any respect," and that "The testimony of the witness Kellogg is so lacking in credibility as to be of substantially no weight."

We have read all the testimony in the record, including that of the witness Kellogg and we thoroughly agree with the manner in which the court characterized his testimony. He was permitted to take the claims in suit one by one, compare them with prior art patents many of which had long since expired, and to state that they were a direct anticipation of the claim concerning which he was testifying. He was an avid witness and his testimony reads as though it was a biased argument rather than a statement of facts. He was much too good an expert in that he extolled the virtues of the prior art, much if not all of which had never been put to use, and deprecated the patents in suit which had been put to extensive use, to such an extreme extent that his testimony carries no conviction.

Defendant argues that if there was any invention made by Gottwald it resided in the method of installing the underground steam piping system rather than in the apparatus disclosed. It is true the record shows that Gottwald's original application contained method claims which were denied by the Patent Office, which at the same time allowed those in suit. We are not impressed with this argument. Even though the advantages reside in the method or manner of installation, such advantages could have been achieved only as a result of the structure disclosed. It was the structure which made possible the new and different method of installation. When that was revealed, the method was obvious.

It would be a useless and well near impossible task to analyze and discuss the numerous prior art patents relied upon to anticipate the various claims of the patents in suit, and in view of the state of the record it would be a futile undertaking for us to so attempt. Especially is this so inasmuch as the sole expert testimony offered by the defendant in explanation of the prior art patents was so lacking in credibility as to carry no substantial weight. Defendant's position in this court, as in the court below, depends upon argument rather than testimony and proven facts. We have carefully considered this argument, especially as it pertains to the prior art patents referred to and discussed in defendant's brief, and we are not persuaded that we would be

justified in refusing to accept the findings as made below. In this connection, it seems fair and appropriate to observe that defendant's present counsel did not participate in the trial below and are not responsible for the record before us.

Defendant suggests that the court below accepted *in toto* the findings of fact as proposed by the plaintiff. The record shows that the court requested each side to submit its proposed findings but it does not show that the court accepted the plaintiff's proposed findings without change or alteration. At any rate, this is a suggestion often made, particularly in patent cases, with the view perhaps of casting a suspicion or reflection upon such findings. There may be instances where there is merit in such a suggestion but we are satisfied that this is not one of those cases. A study of the record is convincing that the trial judge was not only keenly alert to the issues for trial and decision but that he gave the defendant every opportunity to show that the claims in suit were invalid. In fact, he allowed defendant's so-called expert witness almost unlimited latitude in expressing his opinon upon various issues which were before the court for decision.

The court as to patent No. 1,991,455 found:

"3. Prior to February 27, 1931, the filing date of the application on which letters patent No. 1,991,455 issued, no conduit systems had been built of pre-fabricated units, each unit consisting of an inner pipe, a covering load-sustaining shell and heat insulating material.

"4. Prior to February 27, 1931 insulated conduit systems had been built by a pipe being installed after the bottom part of the surrounding tunnel like shell had been completed, and after this the top part of the tunnel structure was built over the installed pipe.

"5. The plaintiff, The Ric-Wil Company, has produced conduits and conduit sections corresponding to the disclosure of letters patent No. 1,991,455, which have been sold, installed and satisfactorily operated.

"6. The installation of unit type of conduits corresponding to the disclosure of letters patent No. 1,991,455 has effected substantial savings of material, labor, amount of excavation, time consumed in installation, breakage, and has made possible installations of such conduits under conditions where installation of older type conduits is impossible.

"7. The construction disclosed in patent No. 1,991,455 overcame° difficulties which had existed in the use of insulated conduit for many years.

"8. The construction of patent No. 1,-991,455 has gone into wide use and has largely displaced prior structures.

"9. The defendant, E. B. Kaiser Company, installed plaintiff's unit type conduit at Peoria, Illinois, and was instructed by the plaintiff in the installation of such conduit.

"10. The defendant, E. B. Kaiser Company, subsequent to its installation of plaintiff's conduit commenced manufacture of EBKO insulated conduit.

"11. The defendant's EBKO insulated conduit also consists of units each having a central pipe, a load-sustaining outer covering, shell or casing, and heat insulating material between them."

The court as to patent No. Re. 22,988 found:

"20. Patent No. Re. 22,988 is directed to an anchor consisting of a plate secured to an inner pipe and passing through a surrounding shell or covering to transmit axial forces to the ground.

"21. None of the claims of patent No. Re. 22,988 are limited to the shape of the plate.

"22. None of the claims of patent No. Re. 22,988 are limited to preclude flanges or other material overlying parts of the surface of the plate.

"23. The anchor of patent No. Re. 22,-988 has gone into extensive use and is effective in anchoring a conduit.

"24. Defendant has produced anchors which are square and of substantially the same proportions as plaintiff's anchors and

which are connected to the inner pipe and pass between the ends of a surrounding shell.

"25. Defendant has produced a round anchor which is secured to the inner pipe and passes between and beyond the ends of the shell or casing sections, transmitting its pressure to the ground through flanges on these casing sections."

The court as to patent No. 2,050,968 found:

"12. Letters patent No. 2,050,968 are the first disclosure of a spacer axially movable in a conduit shell and holding a pipe therein against motion toward the top or sides of the shell.

"13. No such spacer has been shown prior to March 25, 1933, the date on which the application which resulted in patent No. 2,050,968 was filed.

"14. The defendant E. B. Kaiser Company also uses a spacer moving in the shell in its conduit and holding the pipe within the shell from moving toward the top or sides thereof.

"15. The defendant's spacer is a flat piece of metal having a notched periphery, and is a 'plate' in the sense in which the word 'plate' is used in patent No. 2,050,-968."

The court also found, "The defendant has taken no testimony of any one having any knowledge of any of the devices of the many references introduced." Then follow the findings with reference to defendant's expert witness Kellogg to which we have heretofore referred.

■ Having concluded that these findings are not clearly erroneous, or to put it another way that they are substantially supported by the record, we find no occasion to discuss further the question of validity or infringement. That conclusion follows from the findings.

■ The defendant contends that it is not liable to plaintiff for material sold to the United States, under Title 28 U.S.C.A. § 1498. We assume if there was proof that such sales were made the contention would be sound. The proof, however, upon which the defendant relies is not only extremely meager but it is of such an indefinite and uncertain nature as to furnish no substantial basis for the contention.

■ The judgment appealed from requires "that defendant account for and pay to plaintiff all profits realized by defendant through the making, using and selling of any and all of the infringing articles and account for and pay to plaintiff damages equalling the profits plaintiff would have made had it made each of the infringing sales made by defendant." The judgment directs that the cause be referred to a Special Master to take evidence and report "an account of profits and damages which Plaintiff has suffered." Defendant contends that this part of the judgment is in conflict with Title 35 U.S.C.A. § 70. This statute, which became effective August 1, 1946, provides that upon a judgment for infringement "the complainant shall be entitled to recover general damages which shall be due compensation for making, using, or selling the invention, not less than a reasonable royalty therefor." Plaintiff in response to this contention cites Binger et al. v. Unger et al., D. C., 7 F.R.D. 121, and Zenith Radio Corp. v. Dictograph Products Co., Inc., D. C., 6 F.R.D. 597, as a "complete answer." An examination of those cases in our opinion shows that they are no answer at all. Neither have we been able to find any authority construing this recent provision. The provision in effect prior to August 1, 1946 provided for recovery by the complainant "in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby." The recent provision does not use the word "profits". It provides recovery for nothing other than "general damages". What elements may be included in such damages is not stated, except they "shall be due compensation". The language appears to make it plain that profits realized by an infringer are not recoverable as such. "General damages" is a broad term which no doubt may include numerous elements depending upon the circumstances of the case. And whether an infringer's profits is an element of such damages depends upon the facts of each individual case. We therefore conclude that the judgment rela-

tive to an accounting is not in conformity with the statutory provision and that it must be modified accordingly.

Other questions raised by the defendant are, we think, without merit and need not be stated or discussed.

The judgment appealed from will be modified in the respect indicated and, as so modified, it is affirmed.