MACHATY v. ASTRA PICTURES,
Inc. et al.

ASTRA PICTURES, Inc. v. EUREKA PRO-
DUCTIONS, Inc.

Nos. 180–181, Docket 22249–22250.

United States Court of Appeals
Second Circuit.

Argued Feb. 13, 1952.

Decided March 28, 1952.

Henry Pearlman, New York City, for appellant Machaty in his suit against Astra Pictures, Inc.; also for defendants-appellants in the case of Astra v. Eureka.

Melvin A. Albert, New York City, for Astra Pictures in the suit of Machaty v. Astra Pictures, Inc.; also for Astra Pictures in the suit of Astra Pictures, Inc. v. Eureka.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The essential facts are the same in both cases; for that reason, the cases were consolidated on appeal. We will first recount the variegated history of "Ecstasy," and later discuss separately the rights of the parties in the two suits.

Gustav Machaty, then a Czechoslovakian citizen, wrote, directed and produced in 1931 and 1932 a film, familiar to American movie audiences as "Ecstasy."[1] Machaty contracted on July 12, 1932 to give Elekta-Film, a Czechoslovakian corporation, world-wide distribution rights to the film, in return for certain royalties. Elekta was to control all foreign licensing of the film until such time as production costs were recouped. (There was evidence that they had still not been recouped up to the time of the suit.) Machaty claimed that a supplementary contract was made with Elekta a few months later, limiting Elekta's distribution control to five years and requiring Machaty's express consent to all foreign licensing. The existence of this modifying agreement was disputed in both suits; the trial judge found against Machaty's claim

1. There was some dispute in the lower court as to whether Machaty was the original author of "Ecstasy." The trial judge found that he was.

that the agreement cut short Elekta's rights after 1937. Meanwhile, in 1934, Elekta licensed Eureka, an American corporation, to act as exclusive exhibitor of the film in the United States until 1939. Eureka took out American copyrights in its own name on the film in 1936 and 1940. In 1938, Elekta licensed Weingarten, Astra's predecessor, for the exclusive rights to American showings when Eureka's license expired in 1939. Weingarten, and Wyngate to whom he assigned part of his rights in "Ecstasy", brought suit against Eureka in 1940 to stop Eureka from further showing the film, and obtained from the New York Supreme Court an injunction and money damages against Eureka. In settlement of the money damages, Eureka made a private agreement to assign to Weingarten and Wyngate the totality of Eureka's interests in all properties—tangible and intangible, including copyrights—which related to "Ecstasy." In 1943 Astra succeeded to their rights. In 1947 Machaty, refusing to recognize Astra's claim to "Ecstasy's" distribution rights, licensed Eureka to exhibit the film in this country. Machaty in 1946 had obtained a Czechoslovakian judgment, and in 1948 a default judgment in New York, declaring that he and not Elekta had sole claim to world-wide distribution rights. In the present suit against Astra, Machaty wants damages for Astra's infringement of his distribution rights since 1944, an injunction against any future infringement, and a trust in favor of Machaty declared upon the copyrights Astra owns, or, in the alternative, cancellation of these copyrights. Astra, in its suit, wants damages based upon infringement of its registered copyrights for Eureka's deliberate showings of the film over Astra's objections. In the district court Machaty's suit was dismissed on the merits, but Astra, in its suit, was granted an interlocutory judgment against Eureka, with the question of damages referred to a master.

## Machaty v. Astra Pictures, Inc.

Machaty's case in the district court was like Leacock's man who "flung himself upon his horse and rode madly off in all directions." [2] On study, however, it appears that whether Machaty's case stands or falls depends on a few basic facts.

The first is whether or not Machaty presently owns the right to license distribution of "Ecstasy," or whether he gave away that right to Elekta in 1932. Machaty seems to concede that this right went to Elekta for an indefinite period by the contract of July 1932, a contract which Astra claims is still in effect. But Machaty asserts that a new agreement was signed in September 1932, limiting Elekta's rights to five years from that date and requiring Machaty's express approval of all foreign licensees.

The trial judge refused to believe Machaty's story that there was a September contract limiting Elekta's distribution rights. Auerbach, an officer of Elekta who was supposed to have signed the September agreement, denied its existence. Machaty could not produce the original; he could not testify with any certainty where it was or what had happened to it. He tried to introduce a photostat of an alleged copy of the September agreement, which copy had been made from the original by either a friend or Machaty's lawyer. This copy was certified by the Czechoslovakian Consulate General in Paris and by the Regional Court of Commerce in Prague; neither authority had ever seen the original. The Court of Commerce verified the copy on the basis of testimony it had heard in a lawsuit between Machaty and Elekta. Such certifications would not satisfy the requirements of 28 U.S.C. § 1741 or Rule 44(a) Federal Rules of Civil Procedure 28 U.S.C. governing the admission in evidence of foreign documents of record. which the appellants invoke to authorize admissions.[3] But, whether or not a private

---

2. Leacock, *Gertrude the Governess.*

3. "Section 1741. *Foreign Documents, Generally; Copies.*
   "A copy of any foreign document of record or on file in a public office of a foreign country or political subdivision

thereof, certified by the lawful custodian thereof, shall be admissible in evidence when authenticated by a certificate of a consular officer of the United States resident in such foreign country, under the seal of his office, that the copy has

contract like this one had to satisfy those statutory requirements at all, we think that the judge did not abuse his discretion in refusing to accept the copy.

Machaty sought to prove his present ownership of distribution rights in another way. He tried to introduce a Prague judgment he won in 1946 against Elekta, and a similar judgment obtained by default against Elekta in New York in 1948. Both judgments decided that Machaty was the present owner of the distribution rights as against Elekta. The trial judge excluded both judgments because they could not bind Astra, which was not a party to either the Prague or the New York suit.[4] This was correct. As between Machaty and Astra, Astra might be able to utilize defenses to Machaty's claims which were unavailable to Elekta, i. e., laches or estoppel. Since the Machaty-Elekta judgments were not dispositive of Astra's rights, no fact decided in the Machaty-Elekta suits could bind Astra in its own suit; thus the judgments could not be received to prove the existence of the September agreement —an essential fact in the Machaty-Astra litigation.

Machaty attemped in the trial court to base his action on a copyright theory that ran like this: American copyrights taken out by Eureka as a sub-licensee of Elekta, and later assigned to Astra, were impressed with a trust in favor of Machaty, the author; therefore, even if Astra's license from Elekta was valid, the equitable title to the copyrights reverted to Machaty when Astra's license terminated in 1944.[5] The trouble with this theory is the July 1932 contract, signed by Machaty, which gave Elekta world-wide distribution rights. Presumably this contract allowed Elekta or its assigns to procure copyrights necessary for such distribution and to control the use of such copyrights for the duration of the contract. Machaty did not, indeed, in the trial court dispute such an interpretation of the July 1932 contract, but relied solely on establishing the existence of a September 1932 contract, limiting Elekta's controls. One must conclude, then, that any trust impressed upon the copyrights was in Elekta's favor, at least while Elekta controlled world-wide distribution rights. If Elekta is still in control of these rights, then the equitable interest in copyrights, taken out by its assignees, reverts to Elekta and not Machaty.

On this appeal Machaty claims that he was entitled to copyright protection in the United States because he owned a valid Czechoslovakian copyright, obtained by mere publication in that country. Section 8 of the Copyright Act and § 202.1 of the

---

been certified by the lawful custodian."

"Rule 44(a) of the Rules of Civil Procedure:

"An official record or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by his deputy, and accompanied with a certificate that such officer has the custody. * * *

"If the office in which the record is kept is in a foreign state or country, the certificate may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent or by any officer in the foreign service of the United States stationed in the foreign state or county in which the record is kept, and authenticated by the seal of his office."

4. He also excluded the Prague judgment because it was not duly authenticated according to 28 U.S.C. § 1741 and Rule 44(a) F. R. C. P. See note 3, supra.

There was a question as to whether the United States official's certification evidenced only the fact that the Czechoslovakian certifying officer was an official translator for the court or whether it also evidenced that the Czechoslovakian certifier was the lawful custodian of the judgment.

5. The trial judge said that Machaty's rights in any copyrights taken out by Eureka could not be determined in this suit, because Cummins, an officer of Eureka, who was named in the 1940 copyright as author of the story, was not a party to the suit. This was an erroneous ruling, for Astra, the defendant, was the present owner of the copyright; and had received its title from Eureka in whose name the copyrights were taken out. The equitable title to the copyrights in so far as it affected Machaty could thus be determined in a suit between Machaty and Astra. The error, however, did not prejudice Machaty's case. See discussion in text, supra.

Proclamation Copyright Relations Act, 17 U.S.C. § 9 and Proclamation following § 9, and 37 C.F.R. Ch. II, Pt. 202, he says, afford automatic protection in the United States for the holders of Czechoslovakian copyrights. We need not consider what would be the effect on* Machaty's case in the light of his contract with Astra, if he had proved a valid Czechoslovakian copyright, for the fact is that he did not. He merely showed that he had published his film in that country; he did not prove that publication alone is enough under Czechoslovakian law to confer upon the author a valid copyright entitled to United States protection. See Heim v. Universal Pictures Co., 2 Cir., 154 F.2d 480. Nor did he prove his exception from the general rule that an author—even an alien author —must take certain formal steps to obtain an American copyright. 17 U.S.C. § 8 [now § 9].

The trial judge found that, even if Machaty had valid rights since 1932, yet he was guilty of laches in waiting so long to pursue them: "He has permitted defendants to expend large sums of money and widely publish, advertise, and show the picture in the United States without any protest on his part so I find also that plaintiff is guilty of laches and cannot recover in an equitble action on this case." So far as Astra itself is concerned, any money it spent in exploiting the film must have been spent between 1943, when it acquired rights in the film, and 1944, when its license terminated. Expenditures after 1944, if not made pursuant to any valid license, but illegally, should not be used as the basis of an equitable defense of laches or estoppel. Any of Astra's predecessors, however, on the evidence in this case, had good defenses by way of laches to Machaty's claims. It can be reasonably assumed that Astra acquired their interests in "Ecstasy," relying upon Machaty's inaction up to that time, and that all defenses of Astra's predecessors to Machaty's claims were transferred to Astra by the mesne assignments.

All Machaty's theories of action then lead to a dead end. He failed to prove any substantial interest in the film worthy of protection. His suit was deservedly dismissed on the merits. Affirmed.

Astra sued and recovered in the trial court for an alleged infringement by Eureka of Astra's copyrights, which Eureka has assigned to Astra in 1941. Eureka, newly licensed by Machaty in 1947, was exhibiting the film over Astra's protest. The copyrights in question were taken out by Eureka in 1936 and 1940 while it was holding itself out as a valid licensee of Elekta. In the 1941 settlement agreement, made pursuant to the New York judgment enjoining Eureka from showing the picture after its license had run out, Eureka assigned these copyrights to Weingarten and Wyngate, Astra's assignors. The trial judge found for Astra in this suit on the following grounds:

"In an action brought by Max Weingarten and Michael M. Wyngate, Inc., as plaintiffs, against Eureka Productions, Inc., Samuel Cummins and Rose Chatkin, as defendants, in the Supreme Court of the State of New York, it was adjudged on March 26, 1941, that Max Weingarten and Michael M. Wyngate, Inc., exclusively owned all the rights in and to the motion picture entitled 'Ecstasy,' and all the rights of distribution, exploitation and exhibition of the same, and plaintiff in said action recovered a judgment in its favor against the defendants for the sum of $5,425.43.

"On August 22, 1941, these defendants entered into a written contract wherein and whereby, in consideration of Max Weingarten and Michael M. Wyngate, Inc., agreeing to cancel said judgment and assigning, transferring and setting over unto Michael M. Wyngate, Inc. and Max Weingarten, the moving picture film known as 'Ecstasy,' and all properties pertaining thereto, both tangible and intangible, and also as a part of said settlement and written contract, the said defendants in that suit agreed to transfer and set over unto said Max Weingarten and Michael M. Wyngate, Inc., their property rights in and to said two copyrights above referred to and warranted the

title to the same, and also the title and the right to convey said moving picture, and all properties pertaining thereto, both tangible and intangible, including the distribution, exhibition and exploitation or marketing or disposition of said moving picture or the copyright thereto. Said defendants at said time and in said writing covenanted and warranted that the exercise by Michael M. Wyngate, Inc., its successors and assigns, of all rights in connection with the said motion picture and the use and disposition of all properties in connection therewith, should be free and unprejudiced.

"Pursuant to such written agreement, the judgment above referred to against the defendants was settled by the cancellation of said judgment, and by the transfer to the plaintiffs of the motion picture 'Ecstasy,' and all property pertaining thereto, both tangible and intangible."

The provisions of the 1941 settlement agreement to which the judge referred are as follows:

"3. In consideration of your agreement to perform the acts hereinafter provided, we, the undersigned, Eureka, Cummins, Chatkin and Jewel Productions, Inc., do hereby sell, assign, transfer and set over to you, irrevocably and without reservation of any kind whatsoever, all properties tangible and intangible, pertaining to that certain motion picture now or previously known as 'Ecstasy,' including all versions thereof, whether such properties are now in the control of Eureka, Cummins, Chatkin or Jewel Productions Inc., or any of them, or their agents, representatives, employees, licensees, assignees, affiliates, subsidiaries, relatives, or any other party or parties, firm, association or corporation claiming from, through or under Eureka, Cummins, Chatkin or Jewel Productions, Inc. * * * Also included in the conveyance, grant and transfer, * * * are, but without limitation, the copyrights in said picture, the copyright certificates thereof bearing numbers Class L #10141 and Class L 6528 respectively, together with all rights of whatsoever kind and nature, flowing from or pertaining to said copyrights, whether now in being or hereafter created or discovered, as well as all rights in and to the said motion picture and all matters contained therein, or upon which the said picture or any part thereof is based. * * * All grants, conveyances and assignments hereunder on the part of Eureka, Cummins, Chatkin and Jewel Productions Inc. are irrevocable and without reservations of any kind on their part, it being the intention, and the said Eureka, Cummins, Chatkin and Jewel Productions Inc. hereby agreeing, that they hereby divest themselves, and each of them, of any and all rights of whatsoever kind and nature, in and to the said picture and all properties, tangible and intangible, relating thereto, it being agreed that all of such properties, tangible and intangible, and all rights therein, are hereby unqualifiedly conveyed, transferred and set over unto the said Michael M. Wyngate, Inc., its successors and assigns. * * *

"6. Eureka, Cummins, Chatkin and Jewel Productions Inc. hereby represent, covenant and warrant that there are no liens, charges, encumbrances or liabilities of any kind whatsoever, against any of the properties, tangible and intangible, conveyed, transferred and assigned hereunder to Michael M. Wyngate, Inc., nor are there any outstanding claims or commitments of any kind whatsoever in connection with the said picture or the property thereof, tangible or intangible, whereby the distribution, exhibition, exploitation or any other handling or marketing or disposition on the part of Michael M. Wyngate, Inc., its successors and assigns, of the said picture, or the copyrights thereof, or any other rights and properties therein, tangible or intangible, shall in any way be impeded or interfered with, the said Eureka, Cummins, Chatkin and Jewel Productions Inc. hereby representing, warranting

and covenanting that the exercise by Michael M. Wyngate, Inc., its successors and assigns, of any and all rights in connection with the said picture, and the use and disposition of any and all properties in connection therewith, shall be free and unprejudiced.

"7. We agree, and it is of the essence of this agreement, that we will at all times respect, observe and obey the terms of the injunction against us hereinabove mentioned, and we further covenant and agree that we shall not at any time use, employ or include the word 'Ecstasy' in or as part of the title, sub-title or advertising slogan or appeal in connection with any literary, dramatic or motion picture material or medium."

▌ Astra could normally bring this suit only if it were the valid owner of these copyrights. Astra must have received all of Eureka's rights in the copyrights by valid assignment;[6] and, in addition, Eureka must have had authority to take out the copyrights in its own name, and to assign those copyrights, free and clear of any liabilities which would now interfere with Astra's title. See Quinn Brown Public Corporation v. Chilton Co., D.C.S.D.N.Y., 15 F.Supp. 213; Mifflin v. R. H. White Co., 190 U.S. 260, 23 S.Ct. 769, 47 L.Ed. 1040. On this record, we cannot say that Astra has been shown to be the valid owner of the copyrights. Our doubts about Astra's legitimate ownership arise from the following: Elekta licensed Eureka for five years and allowed Eureka to take out copyrights in Eureka's own name. But the contract meant, we think, that, at the end of those five years, Eureka was to assign those copyrights to Elekta or Elekta's new licensee. That new licensee (here it was Weingarten and eventually Astra) would similarly hold the copyrights during his license to facilitate full exercise of his exhibition rights. At the

end of his license, he too would give the copyrights back to Elekta or pass them on to Elekta's new assignee. The arrangement, so far as we can tell, came to this: Eureka took out the copyrights in trust for Elekta, the equitable owner. Weingarten took those copyrights from Eureka, subject to the same trust. See Maurel v. Smith, 2 Cir., 271 F. 211; Cohan v. Richmond, 2 Cir., 86 F.2d 680, 682; Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 2 Cir., 140 F.2d 268; Bisel v. Lander, 3 Cir., 1 F.2d 436. If all this is true, then Astra still has legal title to the copyrights only because of its wrongdoing in not returning them to Elekta when Astra's license ran out in 1944. In the circumstances, we would not usually allow Astra to sue for infringement without showing (1) a continuation from Elekta of its license or copyright rights after 1944, or (2) joinder of Elekta as a party to this suit. Cf. Edward B. Marks Music Corp. v. Jerry Vogel Music Co., supra.

Astra conducted its case in the trial court on the theory that its chain of title to the copyrights did not have to be proved because Eureka was estopped from challenging Astra's title on any ground. In the 1941 settlement agreement, Eureka warranted to Astra the good title to these copyrights and promised uninterrupted enjoyment of them. The broad language of Eureka's covenants of good title is reprinted above; upon this language the trial judge relied in finding total estoppel on Eureka's part to dispute Astra's title. Now it may very well be that Eureka did warrant title to the copyrights against hostile claims like Machaty's, and, to this extent, we tend to agree with the trial judge that Eureka cannot now itself challenge Astra on the basis of such title defects. The broad language of Eureka's covenants would seem to prohibit such a result. But that kind of estoppel does not dispose of this case. We, like the trial judge, would have to find that Eureka additionally war-

6. Eureka also challenged the validity of Wyngate's assignment to Astra in 1943, because it was not filed within three months following its execution, as required by § 44 of the Copyright Act, Title 17. But that section protects only subsequent purchasers and mortgagees of the copyright assigned, and does not invalidate the title of the assignee as against infringers. See New Fiction Pub. Co. v. Star Co., D.C., 220 F. 994.

ranted title against the claims of Elekta which both parties knew at the time controlled the world-wide distribution rights, and from which both parties admittedly derived their own alleged rights to show the picture for a limited number of years.

The 1941 settlement was made pursuant to a judgment for an injunction and money damages granted Weingarten and Wyngate in their suit against Eureka. The New York Supreme Court, in granting the injunction, recognized in its findings of fact [7] that both Weingarten and Eureka obtained their alleged rights in the films as licensees of Elekta, and that Weingarten's rights superseded Eureka's because Eureka's license from Elekta had expired, and Weingarten's was still in effect. We think its injunction, limited by these facts, must be construed to prohibit Eureka's interference with Weingarten or his assigns for as long as Weingarten was a validly licensed exhibitor, since, as soon as Weingarten's license ended, he had no rights in the film worthy of protection. Weingarten's and Eureka's settlement agreement, made against this background, must also, we think, be construed to bear out what both parties knew—i. e., that Wein-

garten had valid rights in the film until 1944 only, as a licensee of Elekta. As a consequence, we think Eureka promised to respect Weingarten's rights only so long as they existed, in fact. Eureka turned over all its properties in the film—tangible and intangible—for use by Weingarten while he was a valid licensee of Elekta. We think it an unreasonable construction of the agreement to say that Eureka promised never to challenge the right of Weingarten or his assignees to show the picture whether or not they were validly licensed to do so. It is much more likely that both parties recognized, when the copyrights were transferred, that they had been obtained pursuant to Eureka's license from Elekta and on behalf of the latter, with Elekta's equitable rights to become operative after its licensee's monopoly had terminated. This is the way we construe the 1941 settlement agreement. Eureka is not then permanently estopped from challenging Astra's title at least on the ground that Astra has not established its equitable ownership of the copyrights as far as Elekta is concerned.

The case, then, in the absence of a valid estoppel on Eureka's part to challenge As-

7. "7. That in and by said agreement of September 19th, 1934, it was agreed and provided therein that the exclusive license and rights were granted to defendant Eureka Productions, Inc. for a period of five years from the day of delivery of the first print or copy of such film.

"18. That on December 20th, 1938, Elekta-Film A. G. entered into a written contract with plaintiff, Max Weingarten, wherein and whereby Elekta-Film A. G. granted to plaintiff, Max Weingarten, the exclusive distribution, exploitation and exhibition rights in and to such motion picture production entitled 'Ecstasy,' for the territory of the United States of America, for the period of five years, commencing immediately with the expiration of the aforementioned distribution contact between Elekta-Film A. G. and defendant Eureka Productions, Inc., dated September 19th, 1934.

"21. That thereupon plaintiff, Max Weingarten, by virtue of his aforementioned distribution contract with Elekta-Film A. G. dated December 20th, 1938, immediately succeeded to the ownership and became, and now is, the owner of the exclusive distribution, exploitation and exhibition rights, and all other rights, in such motion picture production entitled 'Ecstasy,' for the territory of the United States of America, for the period of five years, commencing with the expiration as aforementioned of the distribution and exhibition rights and license of defendant Eureka Productions, Inc., in such motion picture production entitled 'Ecstasy,' for the territory of the United States of America, for the period of five years, commencing with the expiration as aforementioned of the distribution and exhibition rights and license of defendant Eureka Productions, Inc., in such motion picture production; and that by virtue of the aforementioned assignment as made by plaintiff, Max Weingarten, to plaintiff Michael M. Wyngate, Inc., plaintiff Michael M. Wyngate, Inc., became and now is the owner of a sixty per cent (60%) interest in the exclusive distribution, exhibition, and exploitation rights in such motion picture production, as granted under the aforementioned distribution contract dated December 20, 1938, between plaintiff, Max Weingarten, and Elekta-Film A. G."

tra's title, must be decided on the ground of Astra's right to hold the copyrights at present. Since no proof of Astra's authorization from Elekta to hold the copyrights or to bring this suit has been presented, the trial judge should have dismissed Astra's suit, and we must therefore reverse the interlocutory judgment granted below. This dismissal will not, of course, prejudice any later suit brought by Astra or its valid assigns against Eureka.

In Machaty v. Astra Pictures, Inc., judgment affirmed;

In Astra Pictures, Inc. v. Eureka Productions, judgment reversed.