**LASKOWITZ** et al.
v.
**MARIE DESIGNER,** Inc. et al.
No. 15315.

United States District Court,
S. D. California, Central Division.
Feb. 23, 1954.

Terry & Cohn, by Robert B. Terry and W. D. Dubail, St. Louis, Mo., Mason & Graham, by Collins Mason, William R. Graham, Los Angeles, Cal., for plaintiff.

Melvin E. Fink, Paul Gordon, J. Calvin Brown, Los Angeles, Cal., for defendants.

YANKWICH, Chief Judge.

The plaintiff, Joseph F. Laskowitz, is the owner of the patent for an ornamental design for a chair issued on February 14, 1950, on an application filed August 15, 1947. Plaintiff corporation, Contour Chair-Lounge Co., Inc., the exclusive licensee and manufacturer under the letters patent, is a Missouri corporation, incorporated on April 1, 1946, with its legal place of business in the City of St. Louis, Missouri.

The defendant corporation, Marie-Designer, Inc., is a California corporation consisting of the individual defendants Victor E. Le Doux and Marie A. Le Doux. In 1947, "Contour" granted to the individual defendants exclusive distributing rights in the Western States to the "Contour Chair-Lounge", which is the subject of the patent.

By a contract dated April 9, 1949, the distributing rights of the individual defendants were extended throughout the United States and Marie-Designer, Inc., was incorporated as a California corporation to carry on distribution. A new contract was entered into between Contour and Marie Designer on August 25, 1952. This contract and all the defendants' rights under it were terminated on December 31, 1952.

Chairs embodying the patented design in the amount of some six million dollars were sold and some $800,000 was spent in national advertising. The plaintiffs shared in the expenditure, *indirectly*, by adjusting their prices to the sole distributor to absorb the expenditure.

The present action was instituted on March 23, 1953. It charges patent and trade-mark and trade-name infringement and unfair competition, and seeks injunction and damages.

The defendants have denied infringement, have challenged the validity of the patent and, in a counterclaim, seek to recover damages for infringement of copyrighted advertising material by the plaintiffs after the severance of their relationship.

After a hearing, a temporary injunction was issued. An appeal from it is now pending.

The cause has been tried on the merits and submitted.

I

Design Patent

At the core of the entire controversy is the design patent. And it is well to discuss briefly the nature of design patents in order to dispose of the contention of invalidity.

Patents for designs are covered specifically by statute.[1] The requirements which have been in the law since 1842,[2] are that the design be new, original and

---

1. 35 U.S.C.A. § 171.

2. Act of August 29, 1842, 5 Stat. 543.

ornamental. The Supreme Court, in interpreting the Act of 1842, which used only the words "new and original", laid down certain fundamental tests which the courts have followed to the present day.

In stating the object of the statute the Court said:

"The acts of Congress which authorize the grant of patents for designs were plainly intended to give encouragement to the decorative arts. They contemplate not so much utility as appearance, and that, not an abstract impression, or picture, but an aspect given to those objects mentioned in the acts. It is a new and original design for a manufacture, whether of metal or other material; a new and original design for a bust, statue, bas relief, or composition in alto or basso relievo; a new or original impression or ornament to be placed on any article of manufacture; a new and original design for the printing of woolen, silk, cotton, or other fabrics; a new and useful pattern, print, or picture, to be either worked into, or on, any article of manufacture; or a new and original shape or configuration of any article of manufacture—it is one or all of these that the law has in view. And the thing invented or produced, for which a patent is given, is that which gives a peculiar or distinctive appearance to the manufacture, or article to which it may be applied, or to which it gives form. The law manifestly contemplates that giving certain new and original appearances to a manufactured article may enhance its salable value, may enlarge the demand for it, and may be a meritorious service to the public. It therefore proposes to secure for a limited time to the ingenious producer of those appearances the advantages flowing from them."[3]

■■ Significant of the importance of the judicial thinking embodied in the decision just referred to is the fact that it included the "decorative" (i. e. ornamental) character of the design in its requirements for patentability. So when the subsequent reenactment of the section added the latter word it merely made the statutory law conform to the court-made law already in existence. The case just cited dealt with the question of infringement only; the criteria established were used later on to determine patentability. And cases old and new agree that the test is visual. Patentability exists if the design looked at as a whole (le tout ensemble) gives a pleasing impression.[4] Of course, the result must come from the exercise of the inventive faculty.[5] If these elements are present it is not material that the design may embody a regrouping of familiar forms and decorations.[6]

■■ In determining whether a patent design is infringed, the test is, ultimately, the eye test. That is, do the two look alike to the ordinary observer? The Court of Appeals for the Second Circuit has stated the problem in this manner:

"The test of infringement is whether the two designs have substantially the same effect upon the eye—not the eye of an expert, but the eye of the ordinary observer, giving such attention to the matter as purchasers usually give."[7]

And even where the patented design is limited to the form shown in a drawing, any significant differences in configuration and general appearance, as they present themselves to the average buyer of the article on inspection, will be suffi-

3. Gorham Mfg. Company v. White, 2 Cir., 1871, 14 Wall. 511, 524–525, 20 L.Ed. 731.

4. Dobson v. Dornan, 1886, 118 U.S. 10, 15, 6 S.Ct. 946, 30 L.Ed. 63; American Fabrics Co. v. Richmond Lace Works, 2 Cir., 1928, 24 F.2d 365.

5. In re Mains, 1935, 77 F.2d 533, 534, 22 C.C.P.A., Patents, 1299; J. R. Wood & Sons, Inc. v. Abelson's, Inc., 3 Cir., 1934, 74 F.2d 895; Gold Seal Imports, Inc. v. Morris White Fashions, Inc., 2 Cir., 1941, 124 F.2d 141; S. Dresner & Sons, Inc. v. Doppelt, 7 Cir., 1941, 120 F.2d 50; In re Jabour, 1950, 182 F.2d 213, 215, 37 C.C.P.A., Patents, 1084; Cavu Clothes v. Squires, Inc., 6 Cir., 1950, 184 F.2d 30, 31–32; In re Warren, 1952, 194 F.2d 715, 717, 39 C.C.P.A., Patents, 873.

6. American Fabrics Co. v. Richmond Lace Works, 2 Cir., 1928, 24 F.2d 365; In re Johnson, 1949, 175 F.2d 789, 36 C.C. P.A., Patents, 1145; Glen Raven Knitting Mills v. Sanson Hosiery Mills, 4 Cir., 1951, 189 F.2d 845, 849–850.

7. American Fabrics Co. v. Richmond Lace Works, supra [24 F.2d 367], Note 6; Pecora v. Modern Sanitary Dairies, 3 Cir., 1939, 108 F.2d 313; In re Bigelow, 1952, 194 F.2d 550, 552, 39 C.C.P.A., Patents, 835; Sanson Hosiery Mills v. Warren Knitting Mills, 3 Cir., 1953, 202 F.2d 395.

cient to avoid infringement.[8] Or as the Supreme Court has put it, the true test of identity of design "must be sameness of appearance".[9] And the identity of appearance is determined by "sameness of effect upon the eye".[10]

Tested by these rules, we are satisfied that there is invention in the design.

## II

### The Accused Design

 While infringement is denied, no attempt was made by the defendants to show any dissimilarity between the two chairs. Indeed, judging by testimony attempted to be elicited as to the difference in methods of operation and function, I am of the view that the defendants *actually thought* that the departures in the manner of construction of the chairs were so significant as to avoid infringement. But differences in function and in methods of attaining the function, important though they might be in a different type of patent, have no significance in a design patent.

The design is not described in the patent. The claim reads "the ornamental design for the chair substantially as shown". (See, Patent in suit) If

---

8. Edison Electric Appliance Co. v. Fitzgerald Mfg. Co., 2 Cir., 1929, 32 F.2d 705, 706.

9. Gorham Mfg. Co. v. White, 1871, 14 Wall. 511, 526, 20 L.Ed. 731.

10. Gorham Mfg. Co. v. White, supra, Note 9, 14 Wall. at page 527.

The same test obtains under the English Act. See, W. Lusty & Sons Limited v. Morris Wilkinson & Co., Ld., 1953, Reports of Patent, Design and Trade Mark Cases, Vol. LXXI, No. 9, pp. 175–181. It is rather significant that there, as here, certain functional differences were urged as important in determining patentability. The Court's answer was:

"It now becomes necessary for me to examine into the further contention as to whether the registration here in question is or is not shown by the Plaintiffs to be invalid. For that purpose it is necessary to consider the language of Sec. 1(2), of the Act, wherein the matter of novelty and originality is specified. That subsection reads as follows, as far as it is material. 'A design shall not be registered thereunder unless it is new or original and in which before the date of the application for registration has been registered or published in the United Kingdom in respect of the same or any other article or differs from such design only in immaterial details or in features which are variants commonly used in the trade.'

"That subsection in effect means that when it is necessary to examine into the novelty of a registered design, no suggestion of difference can reside in a matter which is an immaterial detail so far as the design as a whole is concerned, or wherein the difference resides in a modification which by reason of its being commonly used in the trade as an alternative or substitute, is one which would commend itself to a workman who, in seeking to apply an old design, required to introduce a trade variant. I do not find myself able to accept the suggestion that in considering the validity of the registration of a design one should examine into each of the features wherein it is said to differ from the prior art, and then to ascertain whether or not each such difference is known as a trade variant. Indeed, were that the correct approach, it seems to me that it would be practically impossible, in many arts at any rate, for there ever to be any novel or original design. A novel combination of features each individually old may well provide sufficient novelty to support registration.

"The plaintiffs have referred to and proved the existence of a number of designs applied to chairs over a considerable period of time, now some thirty years at least, and which are illustrated in Document P. 1. In addition to illustrating existing types of chair, that exhibit shows also a representation of the alleged infringement, and it is I think necessary that I should say this, that in considering that representation, for reasons which I am not myself able precisely to formulate, it fails to give the impression of the design applied to the chair which forms itself upon my mind when examining the actual article. In regard to the two corners where the top of the back terminates, the illustration fails to give that appearance of sharpness which in the actual embodiment I find most striking. This is also a striking feature of the registered design which in the perspective view of the rear gives an accurate representation of this acute corner.

"I mention that fact because the peculiarity of the illustration of the alleged infringement appears to apply also to certain of the designs here illustrated, and Mr. Lusty whom I accept as a reliable, competent and experienced person in this trade, deposed that as to certain of these chairs, which I need not particularly specify, the back is shaped in a manner so as to create the appearance of the sharp corner to which I have adverted. That feature, which as I say, seems to me to be a most striking and remarkable feature of the design, does not appear in any previous chair in association with other features such as I find characterised in the registered design itself; and, having examined not only the Exhibit P. 1 but the other exhibits which illustrate the prior art I am not satisfied that the design which the Defendants have registered differs only in immaterial additions or in acknowledged trade variants, from any design known and available to the trade. I cannot hold that the design here in suit was invalidly registered."

PATENT IN SUIT

Feb. 14, 1950 J. F. LASKOWITZ Des. 157,269

CHAIR

Filed Aug. 15, 1947

FIG. 1

FIG. 2

FIG. 3

INVENTOR,

JOSEPH F. LASKOWITZ.

BY *Robert B. Terry*

ATTORNEY

we apply the visual test no distinction can be seen between the patented and accused chairs, as an examination of the photographs of plaintiffs' chair and the infringing chair shows clearly. (See photographs attached.)

III

Validity of Patent in Suit

In their attack on the validity of the patent the defendants have cited as references several American, one English

(Plaintiffs' Chair.)

We have, in both instances, a chair shaped to conform to the contour of the human body, with two arms and four supporting legs. The only difference in appearance is that in the defendants' chair, the arm supports are solid while in the patented chair they are skeletoned. The arm supports in the accused chair can be turned outward so that one may slide into the chair from the side of it. In the patented chair the arms are stationary. This difference is one of function. It does not produce a substantial difference in appearance. And, as we are dealing with a design patent only, such slight deviation is not sufficient to avoid infringment.

and five French patents. All the patents except five American patents involve various types of chair construction, —each is a patent for a chair *per se, not for the design*. The five French patents (No. 25,764, July 17, 1921; No. 25,765, July 27, 1921; No. 25,786, September 27, 1921; No. 25,818, December 10, 1921; No. 548,425, January 1, 1921) are, in reality, one patent. The four lower in number and later in date are merely additions to the patent, No. 584,425. They all show a reclining chair and mechanical means for tilting the chair into a desired position. The patent is designated as "Meuble genre chaise-longue assurant le maximum de repos dans le

(Infringing Chair.)

minimum de temps. (Furniture of chaise longue type assuring the maximum rest in the shortest time)"

If "the eye" test is applied to the pictures showing the various angles of inclination which can be secured, there is no identity between them and the patent in suit. The American patents, other than the design patents, are:

| | | | |
|---|---|---|---|
| 6,594 | Liniken | July | 17, 1849 |
| 102,498 | Close | May | 3, 1870 |
| 131,419 | Black | September | 17, 1872 |
| 149,804 | Stewart | April | 14, 1874 |
| 182,950 | Nichols, et al. | October | 3, 1876 |
| 246,556 | Reich | August | 30, 1881 |
| 421,392 | Dossett | February | 18, 1890 |
| 476,474 | Moir | June | 7, 1892 |
| 581,888 | Stoemer | May | 4, 1897 |
| 650,448 | Beebe | May | 29, 1900 |
| 683,907 | Brown | October | 8, 1901 |
| 823,841 | Boyd | June | 19, 1906 |
| 941,919 | Greilick | November | 30, 1909 |
| 1,430,248 | Morse | September | 26, 1922 |
| 1,543,612 | Pascaud | June | 23, 1925 |
| 1,872,056 | Bielecky | August | 16, 1932 |
| 2,135,657 | Debski | January | 31, 1933 |
| 2,281,209 | Smith | April | 28, 1942 |

The earliest in point of time, Liniken, which dates back to 1849, merely shows a chair which through various means can be turned into a lounge. In fact, it is called "lounge and chair combined". Others, such as Close, involved reversible seats. The latest one, Smith, 1942, involves a combination "bed and carriage".

▬▬▬ The English patent, Breuer, which counsel for the defendant thought similar to the patent design, merely shows another form of wooden reclin-

ing chair which does not have the appearance of the patented chair. One other observation should be made with reference to these patents. They are all construction or mechanical patents. It is permissible to cite the appearance of a mechanical device as a reference against a design patent.[11] However, in assaying them in order to determine the validity of a design patent, we should not deny patentability to a design merely because some illustrations found in mechanical patents not reduced to practice had some features which put together *might* have produced something similar to the design under consideration. The warning in this respect was sounded by the United States Court of Customs and Patent Appeals in these words:

> "In considering patentability of a proposed design the appearance of the design must be viewed as a whole, as shown by the drawing, or drawings, and compared with something in existence—not with something that might be brought into existence by selecting individual features from prior art and combining them, particularly where combining them would require modification of every individual feature, as would be required here." [12]

The design patents—Jones, Des. 81,480; Debski, Des. 89,126; Rogers, Des. 109,420; Smith, Des. 135,417; Cutrow, Des. 145,927; Luketa, Des. 149,959; Fraser, Des. 153,932—are merely specimens of outdoor reclining chairs made of various kinds of materials, such as wood, fiber, aluminum and the like. Not one of them presents the design of a piece of formal upholstered furniture of massive structure to be used in a drawing room, for which the patent in suit is intended.

 An additional patent cited is plaintiff's own previous design patent, is-

sued on June 25, 1946. A patentee may be denied patentability *over his own prior patent*. This for the reason that a patentee is not entitled to more that one patent for a single invention. And he cannot prolong his monopoly by claiming the same invention in different language.[13]

This design was cited as a reference by the Patent Office in the present patent. No doubt, they saw a distinction between the two. So do we. A comparison of the two shows the prior design to be an armless overstuffed chair over what looks like a box frame. To some extent all chairs in a particular category look the same, reclining chairs included. But an examination of the two by the eye test shows that the old design might be designated as a clumsy overstuffed chair over a box, having no eye appeal. The present one has a more aesthetic look. It has arms. Its shape is more graceful and it is evenly curved, so as to approximate more nearly the posture of the human body sunk into a form.

 Chairs have existed for centuries and men of inventive ability have been at great pains to adopt means for fitting the human body in repose into them. Of necessity, therefore, the scope of invention, especially if we deal with design, is narrow. Utility does not count in a design patent. But utilitarian function does not make a design patent unpatentable. As said by the Court of Customs and Patent Appeals:

> "The mere fact that the designs here sought to be patented may involve some mechanical or utilitarian function does not render them unpatentable. * * * However, in all cases, the invention must relate to the design, and be distinguishable

11. In re Jennings, 1950, 182 F.2d 207, 37 C.C.P.A., Patents, 1023; In re Bigelow, 1952, 194 F.2d 545, 547, 39 C.C.P.A., Patents, 827; In re Weil, Cust. & Pat. App., 1953, 201 F.2d 946.

12. In re Jennings, supra, Note 11, 182 F. 2d at page 208.

13. In re Copeman, 1943, 135 F.2d 349, 352, 30 C.C.P.A., Patents, 962; In re Bigelow, 1952, 194 F.2d 550, 39 C.C.P.A., Patents, 835.

from the mechanical function involved."[14]

In the light of these principles, we believe that there is sufficient difference in the aesthetic effect of the patent in suit over the previous design to amount to patentability.

## IV

### Unfair Competition

On February 7, 1950, the corporate plaintiff caused to be registered in the Patent Office, under the laws of the United States [15] as a trade-mark for the chair, the term "Contour Chair-Lounge". The registration is No. 520737. The statement accompanying it claimed first use and first use in interstate commerce as of November 3, 1945. Since April 1, 1946, the corporate plaintiff has had "Contour Chair-Lounge Co." as its corporate name.

The amended complaint sets forth a claim for infringement of the trade-mark and trade-name through use of the same or identical names by the defendants since the severance of their contractual relations on December 31, 1952. The various acts are denominated "unfair competition" for which redress is sought. The legal basis for granting relief for unfair trade practices is "confusion of source of goods". The object is to prevent a designation which is so confusingly similar to another's trade-mark or trade-name that prospective purchasers

"are likely to regard it as indicating the source identified by the trade-mark or trade name." [16]

The determinant factor is the likelihood of confusion of source. The restatement puts it in this manner:

"The ultimate test of whether or not there is a confusing similarity between a designation and a trade-mark or trade name which it is alleged to infringe is the effect in the market in which they are used. In some cases the probable effect can be determined by a mere comparison of the designation with the trade-mark, or trade name. In other cases extrinsic evidence may be necessary. In any event, the issue is whether an appreciable number of prospective purchasers of the goods or services in connection with which the designation and the trade-mark or trade name are used are likely to regard them as indicating the same source. That a few particularly undiscerning prospective purchasers are likely to be so misled, even though by exercising greater discernment they could avoid the error, is not enough. The issue of confusing similarity is an issue of fact as to the probable or actual reactions of purchasers." [17]

Testimony given in open court and through depositions, as well as the result of a "random" survey or sampling (i.e., a sampling not of a selected group, but of an unsegregated group, not differentiated by age, occupation or the like) in ten cities,—Atlanta, Georgia; Buffalo, New York; Columbus, Ohio; Denver, Colorado; Houston, Texas; Indianapolis, Indiana; Milwaukee, Wisconsin; Philadelphia, Pennsylvania; St. Louis, Missouri; San Francisco, California;—made by a professional, national firm of market researchers,—warrants the conclusion that, due to the extensive publicity through national media which the plaintiffs and the defendants while they acted as the sole distributing agency, have carried on,—in the mind of the buying public, the designation "Contour" has become identified with the plaintiff's chair and the trade-mark and trade-name under which it is marketed.

---

14. In re La Montagne, 1932, 55 F.2d 486, 487, 488, 19 C.C.P.A., Patents, 880 and see, In re Bigelow, supra, Note 13, 194 F.2d at page 550; Hopkins v. Waco Products, Inc., 7 Cir., 1953, 205 F.2d 221, 223–224.

15. 15 U.S.C.A., § 1051 et seq.

16. Restatement, Torts, Sec. 728; see also, Restatement, Torts, Sec. 727. See, the writer's opinion in Brooks Bros. v. Brooks Clothing Co., D.C.Cal., 1945, 60 F.Supp. 442, 450–451.

17. Restatement, Torts, Sec. 728, Comment (a).

As to the trade-mark, the statement filed February 27, 1948 claims the mark "Contour Chair-Lounge" for "upholstered chairs of the elongated type which are longitudinally adjustable for variation of inclination". The word "chair" and the word "lounge" are disclaimed apart from the mark shown. Five specimens are attached showing the trade-mark as "actually used in connection with such goods, the trade-mark being applied to the goods and to wrapping materials for the goods".

█ The trade-mark is valid. The use of the word "Contour" in conjunction with the mark is fanciful. It is not descriptive of the article,—the chair. It refers to the contour of the body of the person sitting in it.[18]

█ There can be no denial that the acts of the defendants, as here epitomized, resulted in confusion in the minds of prospective purchasers who mistook the accused product for the patented article. This was aggravated by the proved attempts of the defendants to represent their chair as an "improved model" of the patented design. These facts, even in the absence of direct infringement, constitute unfair practices for which the courts grant relief.[19]

## V

### The Counterclaim

█ By way of counterclaim the defendants allege infringement of advertising material which had been copyrighted by them. Advertisements, whether in the form of words or pictorial illustrations, may be made the subject of copyright despite the absence of any high artistic or literary merit.[20]

A copyright claim in the record, dated May 25, 1953, refers chiefly to a label entitled "This is Nature's most relaxing pause" accompanying which are illustrations of the plaintiff's chair with a human form in them. The claim of copyright refers to a publication in the Pasadena Independent as of October 24, 1950. There was an advertisement bearing the copyright mark of 1950 of a similar chair with a photograph of a person in it as published in Life of July 24, 1950. A copyright claim for it was made as of October 5, 1950.

It is very obvious that these advertisements were composed at a time when the defendants were acting as distributing agents for the product and were required under the terms of their latest contract, dated August 25, 1952, to spend a definite amount of money ($4 per chair)

18. See, the writer's opinions in Silvers v. Russell, D.C.Cal., 1953, 113 F.Supp. 119; Looz, Inc. v. Ormont, D.C.Cal., 1953, 114 F.Supp. 211.

19. Looz, Inc. v. Ormont, supra, Note 18, 114 F.Supp. at pages 216–218. Unfair competition is governed by state law. And the conclusion expressed in the text and in the opinion just cited accords with the law of California:

"The test of whether or not a secondary meaning has been acquired is set forth in 3 Restatement of the Law of Torts, section 717(b), as follows: 'The issue in each case is whether or not in fact a substantial number of present or prospective purchasers understand the designation, when used in connection with the goods, services or a business, not in its primary lexicographical sense, but as referring to a particular person or association.' * * * It is not necessary that respondents prove fraudulent intent. Appellants may be enjoined 'if the natural consequence of their conduct is such as to cause deception.' Hoover Co. v. Groger, 12 Cal.App.2d 417, 419, 55 P.2d 529, 530." Weatherford v. Eytchison, 1949, 90 Cal.App.2d 379, 384, 202 P.2d 1040, 1043. See, Eastern Columbia, Inc. v. Waldman, 1947, 30 Cal.2d 268, 271–272, 181 P.2d 865.

20. Bleistein v. Donaldson Lithographing Co., 1903, 188 U.S. 239, 251–252, 23 S.Ct. 298, 47 L.Ed. 460. See, Alfred Bell & Co. v. Catalda Fine Arts, 2 Cir., 1951, 191 F.2d 99, 102–104; Stein v. Mazer, 4 Cir., 1953, 204 F.2d 472, 474–475; and see, Yankwich, Originality in the Law of Intellectual Property, 1951, 11 F.R.D. 457, 481. After the present opinion was filed, the Supreme Court in Mazer v. Stein, 74 S.Ct. 460, affirmed the ruling of the Court of Appeals for the Fourth Circuit in Stein v. Mazer, supra this note.

for advertising. The plaintiff shared in the cost of the advertising by making allowances to the defendant in the price of the product sold to them and the public. The wording of the clause is revealing:

"8. It is contemplated by the Parties *that it is in the best interest of the Parties* during the continuance of this contract that the Distributor expend the sum of Four ($4.00) Dollars per chair in national advertising. It is recognized that the Distributor is not now financially able to commit itself to expend such amount at this time. *It is therefore agreed that both Parties cooperate to the fullest extent possible to the end that such expenditure be made.*" (Emphasis added)

This clearly contemplates cooperation in advertising. And there was such. An examination of the illustrations shows that the chair pictured is the *plaintiff's model* into which a human being is made to recline.

I do not think that phrases such as "This is Nature's most restful posture" or phrases emphasizing "the relaxing" qualities of the chair, which are so purely descriptive of the product, comply even with the slight requirement of originality in the law of copyright as applied to advertisements.[21] For, as said by the Court of Appeals for the Sixth Circuit, one

"could not copyright a system or method of selling a product."[22]

And, while under the teachings of the case just cited, the defendants could copyright a set of original symbols or designs used as a means in the sale of their product, a representation, either photographic or linear, of the plaintiff's product with a human form in it does not constitute protectible originality.[23]

---

21. Gross v. Seligman, 2 Cir., 1914, 212 F. 930.

22. Kaeser & Blair, Inc. v. Merchants' Ass'n, 6 Cir., 1933, 64 F.2d 575, 577.

23. See, Baker v. Selden, 1879, 101 U.S. 99, 106–107, 25 L.Ed. 841, in which the Supreme Court, in an early and leading case, in the law of copyright, approved certain English cases which enunciated the principle just stated.

Among the cases referred to is one which,—strange as it may seem,—presents a situation almost identical with the situation which confronts us here. The case is Cobbett v. Woodward, 1872, 14 L.R.Eq. 407. There the plaintiff, an upholsterer and house-furnisher, who carried on an extensive business and executed orders for furniture and other articles for various parts of England, published in 1866, a work on the subject of furnishing and furniture under the title of "Cobbett & Co's New Furnishing Guide" or the "Illustrated Furnishing Guide". The book contained many engravings and illustrations of the designs of articles of furniture sold by the firm made from goods manufactured and sold by them. The work was registered as a new publication. The defendant published a work entitled "F. Woodward & Co's Illustrated Furniture Guide" or "New Furnishing Guide", which was, in a great measure, copied from the plaintiff's book. The plaintiff brought suit in equity, claiming infringement of copyrighted material. Although the Court found that the style of plaintiff's book had been adopted and *as many as fifty-five* of his drawings of decorated furniture had been copied, nonetheless, the Court held that plaintiff was not entitled to injunctive relief because the illustrations were not copyrightable material. Lord Romilly, the Master of the Rolls, stated:

" * * * this is a mere advertisement for the sale of particular articles which *any one might imitate, and any one might advertise for sale.*" (p. 413)

And, after drawing the distinction between this type of composition and compilations such as a directory, concordance or a dictionary, he stated:

"To draw the distinction more clearly; If a man not being a vendor of any of the articles in question were to publish a work for the purpose of informing the public of what was the most convenient species of articles of house furniture, or the most graceful species of decorations for articles of house furniture, what they ought to cost, and where they might be bought, and were to illustrate his work with designs and with drawings of each article he described—such a work as this could not be pirated with impunity, and the attempt to do so would be stopped by the injunction of the Court of Chancery; yet, if it were done with no such object but solely for the purpose of advertising

More, the material having been produced at the time when the defendants were the sole distributors of the plaintiff's product and used in promoting for mutual benefit ("in the best interest of the parties" as the contract puts it) the sale of the chairs of the patented design, the defendants, as already noted, participating in the cost of the exploitation through price adjustment, the advertisements were the result of joint authorship,—produced for the joint benefit of the parties to the contract.[24]

It does not appear that up to the time the present controversy arose, the defendants made any claim to the exclusive right to the advertising material or symbols. After the termination of the relationship, the symbols which represented the *plaintiff's chair, were not changed* so as to represent the infringing chair. And it is not reasonable that a claim of damages should arise in favor of the defendants for the representation of the plaintiff's product, by the addition of the human form to it.

So we are confronted with a situation in which the words of the Court of Appeals for the Second Circuit in an old case apply with great appropriateness:

"The result is that there was a joint co-operation in carrying out the effort * * *."[25]

particular articles for sale, and promoting the private trade of the publisher by the sale of articles which any other person might sell as well as the first advertiser, and if in fact it contained little more than an illustrated inventory of the contents of a warehouse, I know of no law which, while it would not prevent the second advertiser from selling the same articles, would prevent him from using the same advertisement, provided he did not in such advertisement by any device suggest that he was selling the works and designs of the first advertiser." (p. 413)

The entire paragraph just quoted is reproduced and approved by the Court in Baker v. Selden, supra. So we have, not only an approval of the principle declared, but of the very words into which it is cast. Later cases have followed this rul-

Here, the advertisement was for the benefit of the joint adventurers. In the making of it, the chair of the plaintiff was used. The entire object was to publicize it. Photographic or other representations of the chair were used. The plaintiffs shared in the cost of the exploitation by means of this advertising material. Therefore, regardless of the extent of the contribution which each made to it, we have a case of joint proprietorship or authorship of an advertising scheme for the benefit of a joint venture. The ownership inured to the benefit of both with the right of each to use it not only when the relationship existed, but also afterwards. The copyright was in the name of the defendant corporation. But, to use the words of Judge Learned Hand, when the case just cited was before him:

"(The defendants) became constructive trustees for (the plaintiffs) in whatever right they got, legal or equitable."[26]

It follows that the defendants have not shown any grounds for recovery under their counterclaim.

## VI

### Damages

The plaintiffs seek several kinds of damages. The rules as to damages, incidental to infringement of a design pat-

ing. They also hold that one cannot obtain a copyright on a reproduction of one's own unpatented article. See, Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279; Jack Adelman, Inc. v. Sonners & Gordon, D.C.N.Y., 1934, 112 F.Supp. 187, 188–190.

24. 18 C.J.S., Copyright and Literary Property, § 11; and see, Maurel v. Smith, 2 Cir., 1915, 220 F. 195 (per Learned Hand); Bisel v. Ladner, 3 Cir., 1924, 1 F.2d 436; Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 2 Cir., 1944, 140 F.2d 266, 267; Machaty v. Astra Pictures, 2 Cir., 1952, 197 F.2d 138, 144.

25. Maurel v. Smith, 2 Cir., 1921, 271 F. 211, 215.

26. Maurel v. Smith, supra, Note 24, 220 F. at page 201.

ent, have been clarified by recent statutory amendments. The measure of damages for an infringement of patent design to an article of manufacture is the

"total profit [of the infringer], but not less than $250".[27]

The section also allows such general recovery as is permitted under the general patent law. However, in order to avoid the recovery of profits twice, it provides that the plaintiff

"shall not twice recover the profit made from the infringement." [28]

As to the recovery of the profit, the object of the amendment would seem to make the law of damages for infringement of design patents conform to the provisions relating to infringement of copyright.[29] They lodge discretion in the court to allow the statutory maximum even where the profit is shown to be less.[30]

The presumption of loss flows from infringement. Recovery of profits may be had when there is proof of use of the mark and sales.[31] An accounting, however, will not be ordered merely upon a showing of infringement. Indeed, under the Trade-Mark Acts, an accounting may be denied where an injunction will satisfy the equities of the case.[32]

The same rule applies in unfair competition.[33]

In addition to compensatory damages for infringement and unfair competition, the plaintiffs in the third cause of action, based on diversity of citizenship, have another demand for damages. The count reiterates the contractual relationship between the parties, charges the defendants with palming off their own devices as those of the plaintiff since its termination, alleges damage to its reputation and good will, and loss of profits in the sum of $50,000. It also alleges that the defendants and their affiliates "have derived unjust profits, the true amount of which are at present unknown to plaintiff."

Frankly, the plaintiffs' demands for damages give the impression of a desire —to use the words of John Milton,— "to execute fierce vengeance". For, after praying for the full recovery allowable for infringement and unfair competition, the complaint restates the acts which constitute the infringement of the patent, trade-mark and trade name, and the unfair competition, *presumably as a distinct, general tort*, and asks the damages noted. Additionally, punitive damages are sought in the sum of $100,000, and a trebling of the general damages, both statutory and other.

The award of compensatory damages for patent infringement is mandatory under the statute.[34] And, while the Court may increase them and also award punitive damages when oppressive or fraudulent conduct on the part of the defendant is shown to exist, the exercise of this power is discretionary.[35] Whatever may have been the practice prior to

27. 35 U.S.C.A. § 289.

28. 35 U.S.C.A. § 289.

29. 17 U.S.C.A. § 101(b).

30. F. W. Woolworth Co. v. Contemporary Arts, Inc., 1952, 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276.

31. Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge, 1942, 316 U.S. 203, 206, 62 S.Ct. 1022, 86 L.Ed. 1381.

32. Golden West Brewing Co. v. Milonas & Sons, 9 Cir., 1939, 104 F.2d 880, 881, 882; Hemmeter Cigar Co. v. Congress Cigar Co., 6 Cir., 1941, 118 F.2d 64, 71; Durable Toy & Novelty Corp. v. J. Chein & Co., 2 Cir., 1943, 133 F.2d 853; Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, 131, 67 S.Ct.

1136, 91 L.Ed. 1386; Q-Tips Inc. v. Johnson & Johnson, 3 Cir., 1953, 206 F.2d 144, 149.

33. Straus v. Notaseme Hosiery Co., 1916, 240 U.S. 179, 181–183, 36 S.Ct. 288, 60 L.Ed. 590; Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, 131–132, 67 S.Ct. 1136, 91 L.Ed. 1386; McCormick & Co. v. B. Manischewitz Co., 6 Cir., 1953, 206 F.2d 744, 747–748.

34. 35 U.S.C.A. § 284; Switzer Bros. v. Centennial Liquor Stores, 5 Cir., 1951, 186 F.2d 414, 415; Middleton v. Wiley, 8 Cir., 1952, 195 F.2d 844, 847; Livesay Industries, Inc. v. Livesay Window Co., 5 Cir., 1953, 202 F.2d 378, 380–381.

35. Kelley-Koett Mfg. Co. v. McEuen, 6 Cir., 1942, 130 F.2d 488, 495; Amuse-

the recent statutory amendments, the general damages *now* recoverable are the detriment suffered by the plaintiffs through the infringement.[36] The profits of the infringer may be the measure, when no other is adequate.[37] Whichever determinative method is used, the aim is to "compensate (the plaintiff) for the infringement", as the statute declares specifically. And when the profits or a reasonable royalty are chosen as a basis, there is no room for the award of other damages.[38] In ascertaining damages, the object has always been to approximate, as nearly as possible, the *actual loss* suffered by the patentee.[39]

Under a claim of "unfair competition", recovery may be had for inequitable practices in conjunction with redress for patent, trade-mark or trade-name infringement. But we know of no principle of law or equity which would allow *an additional recovery of general damages,* in the name of a nebulous tort which is created by grouping together *all* the wrongs the plaintiffs assert.

Recovery in this case should be limited to such compensatory damages as may be found. The reasons are obvious. A very friendly and seemingly profitable association existed for many years between the parties. As the sole distributor of the product, the defendants expended large sums of money in making it known. The individual defendants participated in many meetings of the entire group interested in its promotion. The subsidiaries organized by the defendants and the agencies they established exploited the patented article and helped popularize the name "contour" for this type of *chaise-longue.*

The fact that allowance was made in price adjustment for the promotional expenditures does not detract from the beneficial effect of the joint efforts. On the contrary, it attests to their worth to the common enterprise. In the circumstances, the Court would not be warranted in penalizing the defendants, either by increasing or trebling

ment Corp. of America v. Mattson, 5 Cir., 1943, 138 F.2d 693, 697; Enterprise Mfg. Co. v. Shakespeare Co., 6 Cir., 1944, 141 F.2d 916; Russell Box Co. v. Grant Paper Box Co., 1 Cir., 1953, 203 F.2d 177, 183.

36. 35 U.S.C.A. § 284.

37. Duplate Corp. v. Triplex Safety Glass Co., 1936, 298 U.S. 448, 457, 56 S.Ct. 792, 796, 80 L.Ed. 1274:
"*The wrongdoer must yield the gains begotten of his wrong.*" (Emphasis added.)
"In patent nomenclature what the infringer *makes* is 'profits,' what the owner of the patent *loses* by such infringement is 'damages.'" Diamond Stone-Sawing Machine Co. v. Brown, 2 Cir., 1908, 166 F. 306. (Emphasis added.)
This statement is quoted with approval in Duplate Corp. v. Triplex Safety Glass Co., supra, 298 U.S. at page 451, 56 S. Ct. at page 793, 80 L.Ed. 1274.
"As the exclusive right conferred by the patent was property, and the infringement was a tortious taking of a part of that property, *the normal measure of damages was the value of what was taken.*" Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 1915, 235 U.S. 641, 648, 35 S.Ct. 221, 224, 59 L.Ed. 398. (Emphasis added.)

38. 69 C.J.S., Patents, §§ 357–358; Restatement, Torts, Secs. 745–747.
"The recent provision does not use the word 'profits'. It provides recovery for nothing other than 'general damages'. What elements may be included in such damages is not stated, except they 'shall be due compensation'. The language appears to make it plain that profits realized by an infringer are not recoverable as such. 'General damages' is a broad term which no doubt may include numerous elements depending upon the circumstances of the case. And whether an infringer's profits is an element of such damages depends upon the facts of each individual case." Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 1950, 179 F.2d 401, 407.
The Court of Appeals for the Ninth Circuit has expressed the same view. See, Faulkner v. Gibbs, 9 Cir., 1952, 199 F.2d 635, 638, where the analysis just given of the meaning of "general damages" is referred to *in Note 5.*

39. Power Specialty Co. v. Connecticut Light & Power Co., 2 Cir., 1936, 80 F. 2d 874; Reynolds Spring Co. v. L. A. Young Industries, Inc., 6 Cir., 1939, 101 F.2d 257, 261; Condenser Corp. of America v. Micamold Radio Corp., 2 Cir., 1944, 145 F.2d 878, 880.

the damages or by awarding punitive damages.[40] The same considerations lead to the conviction that an injunction will achieve a full measure of equity between the parties as to the infringement of the trade-mark and the count for unfair competition, and that no accounting for profits, *as to these matters*, should be allowed. As to the statutory compensatory damages, the Court is of the view that there should not be, *for the present*, a reference to a Master, but that the matter should wait the finality of the Judgment and Decree, unless, of course, the parties agree otherwise.

Judgment and Decree will be for the plaintiffs, the terms to conform to the views here expressed.

40. A court of equity will be more inclined to listen to him who heeds the Biblical command, "Thou shalt not avenge" (Leviticus XIX, 18) than to one who, like Coriolanus, is "vengeance proud". (Shakespeare, Coriolanus, Act II, Sc. 2, L. 6). Appropriate are the words of the Court of Appeals for the Second Circuit in Diamond Stone-Sawing Machine Co. v. Brown, supra, Note 37, 166 F. at page 308:

"An infringer is not an outlaw. If convinced that the patent is *invalid or* that he is not infringing he can go on and use the machine said to be covered by the claims, subject to the risk of an injunction and an accounting. If the patent be newly issued and generally infringed his act *should not be viewed in the same light as if the patent had been adjudicated and a license fee established.* Ordinarily it is not until the validity of the patent has been established that parties are willing to pay for privileges under it." (Emphasis added.)